SIXTH DIVISION
APRIL 28, 2006

1-03-3695

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 24415 |
| | ) | |
| CARLOS DESANTIAGO, | ) | Honorable |
| | ) | Stuart Palmer, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TULLY delivered the opinion of the court:

In sum, the incident giving rise to this appeal occurred as follows: Defendant-appellant, Carlos Desantiago (Defendant), and his friend, Arthur Guerrero, both Latin King gang members, were traveling in a white van in the early morning of September 9, 2001. While driving near the intersection of West 26th Street and South Hamlin Avenue in Chicago, Illinois, Defendant and Guerrero became involved in a verbal altercation with three young males, all three of whom were members of the rival Two-Sixers gang. After exchanging gang signs and gang slogans with the three males, Defendant briefly exited the white van and, holding a metal object in his hands, confronted the three males. After a brief verbal altercation, Defendant reentered the white van.

After reentering the white van, Defendant drove the white van onto the sidewalk where the three males were walking. Two of the males, Jason Balboa and Alberto Ruiz, were able to run into the street and avoid being struck by the white van driven by Defendant. However, one of the three males, Eduardo Plomero, was struck and driven over by the white van. Eduardo

Plomero was taken to the hospital and later died of the injuries he sustained from being struck and driven over by the white van.

Following a jury trial in the circuit court of Cook County, Defendant was found guilty of first degree murder of Eduardo Plomero, attempted first degree murder of Jason Balboa, and attempted first degree murder of Alberto Ruiz.

On appeal, Defendant contends that plaintiff-appellee, the People of the State of Illinois (the State), engaged in intentional misconduct and contends that the trial court made numerous errors such that Defendant was deprived of a fair trial. Specifically, on appeal, Defendant contends that (1) the State's comments during closing argument incited the jury to act on passion and outrage rather than on the evidence offered during the course of the trial; (2) the State's comments at different times during the trial wrongly suggested that Defendant's trial counsel had convinced witnesses to offer false testimony at trial; (3) Defendant was denied his constitutional right to confront the witnesses against him when, following Guerrero's claimed memory failure at trial, Guerrero's grand jury testimony was read to the jury; (4) Defendant was substantially prejudiced by the coroner's conclusion at trial that the cause of Plomero's death was "homicide"; and (5) the cumulative effect of the trial court errors and the State's improper conduct resulted in a denial of Defendant's right to a fair trial. For the following reasons, we affirm Defendant's convictions.

## FACTS

The record sets forth the following additional relevant facts. After striking and driving over Plomero with the white van in the early morning of September 9, 2001, Defendant crashed

the white van between a building and a concrete bench near the intersection of West 26th Street and South Hamlin Avenue. Once the white van crashed, Defendant and Guerrero exited the white van and both fled the scene on foot.

Officers Bert Munguia and David Rodriguez were on patrol near the intersection of West 26th Street and South Hamlin Avenue during the early morning of September 9, 2001. Upon observing the white van travel onto the sidewalk in pursuit of the three males, the officers immediately traveled to the scene. While en route to the scene, the officers were unable to observe the white van and, therefore, the officers did not observe the white van strike and drive over Plomero. When Officers Munguia and Rodriguez arrived at the scene, the white van had crashed and Defendant and Guerrero were running from the crashed van at a "suspicious" pace.

While Officers Munguia and Rodriguez were unable to observe the white van strike Plomero, Arnaldo Orozco, whose car was stopped at the traffic light at the intersection of West 26th Street and South Hamlin Avenue, witnessed the incident and testified at trial as to what he observed. Orozco confirmed that the white van was traveling on the sidewalk at a rate of approximately 30 to 40 miles per hour. Orozco also observed the white van pursuing three males, all of whom attempted to run away from the fast-approaching white van.

Orozco further testified that while two of the males were able to avoid the oncoming white van by running off the sidewalk and into the street, the third male, who turned out to be Plomero, was unable to do so and was struck by the front passenger's side of the white van. Orozco stated that, after striking Plomero, the white van continued on and drove over Plomero, ultimately crashing between a concrete park bench and a building. Orozco testified that

following the crash, he observed two men exit the driver's side door of their white van and flee the scene on foot. Orozco testified that after he observed the incident, he drove his car away from the scene and did not report the incident based on his fear that the incident was gang-related and based on his concern of gang retaliation.

Upon arriving at the scene, Officers Munguia and Rodriguez stopped Defendant and Guerrero, who had been fleeing the scene at a "suspicious" pace. Defendant told Officer Rodriguez that someone had forcefully attempted to obtain possession of the white van. While they were speaking with Defendant and Guerrero, Officers Munguia and Rodriguez heard what they believed to be loud breaking glass or gunshots originating from the area of the crashed white van. Both Officer Munguia and Officer Rodriguez immediately ran toward the scene of the crashed white van. Defendant and Guerrero once again fled the scene on foot.

After fleeing the scene on foot, Defendant placed a telephone call to his girlfriend, Belin Avalos. During their conversation, Defendant stated that he had been chased by three males and admitted to Avalos that he may have driven over one of the three males. Defendant instructed Avalos to contact the Chicago police department and falsely report that the white van had been stolen. Defendant also instructed Avalos to inform anyone who inquired as to his whereabouts that he was in Kankakee for the weekend with Avalos' brother.

After speaking with Defendant, Avalos traveled to the Chicago police department and attempted to file a false report that the white van had been stolen; however, Avalos was unable to do so because she did not have the white van's vehicle identification number. By the time Avalos returned from the police station, Defendant was already at their residence in Berwyn,

4

Illinois.

When Officers Munguia and Rodriguez left Defendant and Guerrero and approached the scene of the crashed white van, the officers observed two males smashing the windows of the white van with bolt cutters. The two males, later confirmed to be Balboa and Ruiz, were apprehended by the officers and taken to the 10th district Chicago police station. At that time, Balboa and Ruiz informed Officers Munguia and Rodriguez that the driver of the white van had attempted to run over the three males and the third male, Plomero, was still missing.

In response to a radio assignment, Officer Pruger reported to the scene of the crashed white van. After speaking with Officers Munguia and Rodriguez, who were already present at the scene, Officer Pruger noticed Plomero lying on the sidewalk in the alley between South Ridgeway Avenue and South Hamlin Avenue. Plomero was badly injured and was bleeding profusely. Plomero was transported to Mt. Sinai Hospital in critical but stable condition. Plomero subsequently died of the injuries he sustained as a result of being struck and driven over by the white van.

At approximately 7 a.m. on September 9, 2001, four Chicago police department detectives traveled to Defendant's residence to investigate Defendant's role in the events that led to Plomero's extensive injuries and ultimate death. Avalos, who believed that the detectives were investigating her report that the white van had been stolen, stated that she had double-parked the white van and left the engine running while she carried her baby inside. Avalos stated that when she returned, the white van had been stolen.

One of the detectives who traveled to Defendant's home, Detective Lascola, observed a

pair of men's shoes in the front hallway, the soles of which contained slivers of glass. Avalos confirmed that the shoes belonged to Defendant. Avalos told the detectives that Defendant was not home; however, Detective Lascola found Defendant lying on the bed in his bedroom. At that time, Defendant was taken into custody and transported to local police headquarters for questioning. In addition, Avalos was also taken into custody and transported to local police headquarters for questioning regarding her false police report, at which time Avalos confirmed that the white van had not been stolen and that she filed the false report at Defendant's request.

Once Defendant had been told that Avalos had admitted filing the false police report, Defendant altered his story and provided a written statement to Assistant State's Attorney Guy Lisuzzo. In his written statement, Defendant confirmed his role in the events surrounding Plomero's death. Significantly, Defendant stated that he had chased the three males onto the sidewalk because he "wanted to teach them a lesson." Defendant stated that he was driving the white van on the sidewalk at a rate of 30 miles per hour and stated that he heard a loud boom when he drove over Plomero with the white van. Defendant stated that the three males had thrown some rocks at the white van. Defendant never stated that anyone had a gun or that he heard gunshots. On the contrary, Defendant confirmed that, had he wished to do so, he could have driven from the scene without driving on the sidewalk or chasing the three males.

On September 21, 2001, both Avalos and Guerrero testified at a grand jury proceeding. At the grand jury proceeding, Guerrero confirmed the circumstances surrounding Plomero's death. Notably, Guerrero testified that, prior to striking and driving over Plomero, Guerrero told Defendant to stop chasing the three males so that he and Defendant could fight the three males.

6

At no time during his grand jury testimony did Guerrero hint that gunshots were fired before, during or after the incident.

In addition, Avalos testified at that grand jury proceeding and confirmed that Defendant had instructed her to file the false police report. Avalos never suggested that Defendant had told her that anyone had chased the van or that he had heard gunshots prior to striking and driving over Plomero.

At Defendant's trial, Guerrero testified on behalf of the State. During his testimony, Guerrero confirmed that he had been arrested at least 24 times, that he had been a member of the Latin Kings gang, and that the Two-Sixers gang was a rival of the Latin Kings gang. Guerrero, however, testified that he recently had been attacked and hit on the head with a shovel and, as a result, he could recall neither testifying before the grand jury on September 21, 2001, nor the events of September 9, 2001. Guerrero was then questioned by the State regarding the content of his grand jury testimony.

During cross-examination, Defendant's trial counsel asked Guerrero if he had ever helped Defendant commit any crime, to which Guerrero stated, "No." When asked whether he was in the white van on September 9, 2001, Guerrero answered, "Nope." Finally, Defendant's trial counsel asked Guerrero if he had been offered "any sort of deal" by the State such that, in exchange for his grand jury testimony, Guerrero would not be charged in connection with the events of September 9, 2001. Guerrero's reply was "No, sir." Following Defendant's trial counsel's cross-examination of Guerrero, Assistant State's Attorney George Cannelis testified for the State and confirmed that he had been present at the September 21, 2001, grand jury

proceeding and confirmed that he had witnessed Guerrero testify on that date. The transcript of Guerrero's grand jury testimony subsequently was published to the jury.

Avalos also testified at Defendant's trial. In contrast to her grand jury testimony, Avalos testified at trial that, during their telephone conversation immediately following the incident, Defendant told her that he had been chased by a group of males who had bolt cutters, bottles, and rocks. Avalos also testified at trial that Defendant stated that he had heard gunshots prior to driving the white van onto the sidewalk.

Defendant testified at the trial on his own behalf and stated that at approximately 1:30 a.m. on September 9, 2001, he was traveling in the white van with Guerrero toward Guerrero's home. Defendant stated that while his white van was stopped at a traffic light at the intersection of South Hamlin Avenue and West 26th Street, six males began throwing rocks and bottles at the white van he was driving. Defendant stated that, in an effort to escape the situation, he turned left toward California Avenue.

Defendant testified that, due to the late night traffic, he was unable to escape the six males, who continued to chase the white van and throw rocks and bottles at the white van. Defendant testified that he then exited the white van and, holding a metal pipe, confronted the group of males. Defendant testified that when he exited the white van, one of the males was running toward him, holding his jeans, which gave Defendant the impression that the male had a gun. Defendant stated that he immediately reentered the white van and, in an effort to avoid the traffic and quickly escape the scene, drove the white van onto the sidewalk. Defendant testified that he then heard five gunshots, which caused Defendant to duck down below the steering

8

wheel.  Defendant stated that he then lost control of the white van and crashed.  Finally, Defendant testified that he may have run over Plomero with the white van.

During cross-examination, the State asked Defendant why, prior to his testimony at trial, he had never mentioned that there were six males instead of three males; never mentioned that one of the males had a gun; never mentioned that he had heard gunshots; never mentioned that he ducked down underneath the steering wheel to avoid the gunshots; and never suggested that he was acting in self defense when he drove onto the sidewalk.  Defendant stated that he had never mentioned this information prior to trial because he was scared.

Cook County Deputy Medical Examiner Dr. Eupil Choi performed a post-mortem examination on Plomero and testified at trial.  Dr. Choi testified that his post-mortem examination revealed numerous abrasions on Plomero's forehead, earlobe area and back of head, as well as scrapings over Plomero's left chest and abdomen area.  Dr. Choi also stated that Plomero had sustained a fractured skull and an examination of Plomero's brain revealed evidence of brain hemorrhage and contusions.  Dr. Choi concluded that, based on a reasonable degree of medical certainty, the cause of Plomero's death was "homicide" caused by Plomero being struck and driven over by the white van.

The jury subsequently found Defendant guilty of first degree murder of Eduardo Plomero, attempted first degree murder of Alberto Ruiz, and attempted first degree murder of Jason Balboa.  Defendant filed this timely appeal.

DISCUSSION

On appeal, Defendant alleges that on several occasions during the trial, the State engaged

9

in misconduct that "substantially prejudiced" Defendant such that a new trial is necessary. Defendant first cites to the following statement, which the State prosecutor made during his closing argument to the jury:

"Send a message, folks . . . We're not going to stand by this senseless stupid gang murders. You send a message. You let him [Defendant] know that our community is not gonna stand for that. You let him know that. You listen and you let him know. Make him listen to you.

He [Defendant] made a lot of choices. He's made a lot of attempts to run from his responsibility. You don't let him. You let him know that his running days are over. It's time for him to take responsibility for what he did. It's time for him to take responsibility for running over, running down a 17-year-old boy . . . you let him know we're not standing for that anymore."

Defendant concedes that he failed to object to the comments at trial. Defendant, however, asserts that even though the alleged errors were not properly preserved by objection at trial and by filing posttrial motion for a new trial as required under Illinois law (See People v. Enoch, 122 Ill. 2d 176 (1988)), we should review the alleged prosecutorial misconduct under the plain error rule.

The "plain error rule" to which Defendant refers is set forth in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) and provides as follows:

"Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be

10

noticed although they were not brought to the attention of the trial court."

Illinois reviewing courts may invoke the plain error rule to review improperly preserved alleged errors when (1) the evidence in a criminal case is closely balanced or (2) the error is so fundamental and of such magnitude that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. People v. Johnson, 208 Ill. 2d 53, 64 (2003). "Absent reversible error, there can be no plain error." Johnson, 208 Ill. 2d at 64, citing People v. Williams, 193 Ill. 2d 306, 348 (2000). " ' [T]o determine whether a purported error is "plain" requires a substantive look at it. But if, in the end, the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), the procedural default must be honored.' " Johnson, 208 Ill. 2d at 64, quoting People v. Keene, 169 Ill. 2d 1, 17 (1995).

Our supreme court has recognized that a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain error doctrine. Johnson, 208 Ill. 2d at 64. A prosecutor does not engage in misconduct, however, simply because the prosecutor dwells upon the evil results of crime and urges the fearless administration of justice. People v. Harris, 129 Ill. 2d 123, 159 (1989). To this end, "limited prosecutorial exhortations are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependent solely upon its careful consideration of the specific facts and issues before it." (Emphasis omitted.) Johnson, 208 Ill. 2d at 79.

In an effort to demonstrate the existence of plain error, Defendant relies heavily on our supreme court's opinion in Johnson. Johnson, 208 Ill. 2d 53. A review of the opinion upon

11

which Defendant relies, however, makes it clear that the alleged prosecutorial misconduct in the present case pales in comparison to the outrageous prosecutorial misconduct that our supreme court deemed substantially prejudicial in <u>Johnson</u>. In <u>Johnson</u>, the court reversed and remanded for new trials the convictions of some defendants who had been convicted of murdering a police officer. The prosecutorial misconduct in that case included the prosecutor's use at trial of the actual "bloodied and brain-splattered uniform" of the police officer whom defendants had been accused of murdering; the prosecutor's use of a life-sized, headless mannequin on which to display the torn and bloodied uniform, all of which was later taken into the jury room; the prosecutor's use of emotionally charged and completely immaterial testimony of the murdered police officer's father regarding the pain and loss experienced by the family as a result of his untimely death; and the prosecutor's use of inflammatory and irrelevant testimony of the murdered police officer's supervising officer, who testified regarding both the oath of office originally taken by the murdered officer and the fact that the murdered officer's badge had been retired and placed on display in the " ' honored star case' " at Chicago police department headquarters. <u>Johnson</u>, 208 Ill. 2d at 72-74.

After additional prosecutorial misconduct, all of which was similarly emotionally charged and equally unrelated to the issue of defendants' guilt or innocence, the prosecutor in <u>Johnson</u>, during closing arguments, encouraged the jury to " ' think about [the] message' " that a not guilty verdict would send to the law enforcement community. <u>Johnson</u>, 208 Ill. 2d at 77. Moreover, the prosecutor in <u>Johnson</u> exacerbated the exhortation to "send a message" by merging his position as prosecutor with the jury, the society and the community by stating, " '

We don't have to allow that to happen in our community. *** We as a people can stand together.' " Johnson, 208 Ill. 2d at 79. In granting some of the defendants' requests for a new trial, our supreme court held that the cumulative errors and the pervasive pattern of unfair prejudice caused by the prosecutor's misconduct denied some of the defendants a fair trial and cast doubt upon the reliability of the judicial process. Johnson, 208 Ill. 2d at 79.

After reviewing this record, we disagree with Defendant's contention that the level of prosecutorial misconduct displayed by the State in this case undermined the reliability of Defendant's trial. Defendant correctly points out that it is improper for a prosecutor to distract the jury from the evidence presented and encourage the jury to consider the "message" that its verdict will send to the community or others like the defendant. In this case, however, the State's remarks essentially encouraged the jury to send a message to Defendant, not the community at large. This is clear in that the State's comments included encouragement to "make him listen to you" and "it's time for him to take responsibility for what he did." We believe the State's comments to the jury in this case differ greatly from the prosecutor's misconduct in Johnson, in which the jury was encouraged to convict the defendants in order to send a positive message to the law enforcement community and the community at large rather than to send a message to the defendants.

Defendant also points out that, during closing arguments, the State in this case, like the prosecutor in Johnson, engendered an "us-versus-them" mentality. Defendant contends that when the State commented to the jury that "We're not gonna stand for this . . . Let [Defendant] know that our community is not going to stand for that," in essence, the prosecutor was

13

1-03-3695

improperly aligning himself with the jury and the community on one side and Defendant on the other.  While we disapprove of this type of "us-versus-them" rhetoric, we believe the prosecutor's comments during closing arguments, viewed in the context of the trial as a whole, did not rise to the level of prosecutorial misconduct proscribed by our supreme court in Johnson and did not prejudice Defendant.  This is especially true in light of the fact that the jury was instructed that the comments made by the attorneys during opening statements and closing arguments should not be considered evidence, which served to mitigate any of the potential prejudice of which Defendant now complains.  See People v. Graca, 220 Ill. App. 3d 214 (1991).  Therefore, we cannot agree with Defendant's contention that the State's conduct during closing arguments amounted to plain error.

Defendant next argues that the State improperly suggested that Defendant's trial counsel successfully procured false testimony at trial in an effort to strengthen Defendant's case.  Specifically, Defendant contends that the State suggested that Defendant and Defendant's girlfriend, Belin Avalos, altered their account of the events surrounding Plomero's death at the same time that trial counsel was hired, implying that Defendant's "professional defense attorney" was the driving force behind their changed stories.  Defendant contends that the prejudice caused by the State's misconduct amounted to reversible error.  We disagree.

On redirect examination, a party is permitted to question a witness on matters brought out during cross-examination and, accordingly, may ask a witness questions designed to remove unfavorable inferences or impressions raised by the cross-examination.  People v. Chambers, 179 Ill. App. 3d 565, 577 1989 .  In addition, it is well established that a prosecutor is allowed wide latitude in closing argument

14

*People v. Sutton*, 353 Ill. App. 3d 487, 498 2004 and it is entirely proper for the prosecutor, during closing argument, to comment on the evidence offered at trial and to draw legitimate inferences from the evidence, even if those inferences are detrimental to the defendant. *People v. Weatherspoon*, 63 Ill. App. 3d 315, 322 1978 .

A prosecutor s remarks will be grounds for reversal only when they result in substantial prejudice to the defendant. *Sutton*, 353 Ill. App. 3d at 498. Furthermore, a ruling sustaining a defense objection generally is sufficient to cure any prejudice that may have occurred (People v. Edwards, 195 Ill. 2d 142, 168 (2001)) and a statement made during closing arguments constituting alleged prejudice to the defendant will be cured when the trial court subsequently instructs the jury that closing arguments are not evidence and that they should disregard any argument not based on the evidence. Graca, 220 Ill. App. 3d at 221. Finally, while it is improper for a prosecutor to refer to defense counsel as a "hired gun" or to refer to defense counsel in other similarly pejorative terms, referring to defense counsel as a "professional criminal defense attorney" does not amount to error. Johnson, 208 Ill. 2d at 110.

In this case, prior to trial, Defendant provided law enforcement officers with numerous statements regarding the events of September 9, 2001, including a written and signed statement. In addition, prior to trial, Avalos also provided numerous statements to law enforcement officers and provided testimony under oath at the September 21, 2001 grand jury proceeding regarding the events of September 9, 2001. Throughout that time, neither Defendant nor Avalos ever suggested that Defendant had seen a gun or heard gunshots, or otherwise hinted that Defendant was acting in self-defense when he drove the white van onto the sidewalk on September 9, 2001.

At trial, however, Avalos and Defendant each testified that Defendant had heard gunshots. Each further testified that Defendant's decision to drive onto the sidewalk was motivated by a fear for personal safety and a desire to flee from a dangerous situation. Defendant testified that due to his fear of being struck by one of the bullets fired at the white van, he ducked under the steering wheel as he drove down the sidewalk. Defendant admitted that he may have struck and driven over Plomero with the white van, but suggested that he was acting in self defense.

During redirect questioning, in an effort to uncover when Avalos had learned of this new information, to show that Avalos account was inconsistent with her previous statements, and to demonstrate that Avalos story was a fabrication, the State asked Avalos How many times did you talk to defense counsel about what you were going to testify to? to which Avalos replied Twice. In addition, Defendant points out that during closing argument, the State commented that defense counsel was a professional defense attorney. This comment was followed by an objection from Defendant s trial counsel, which the trial judge sustained.

During his closing argument, Defendant s trial counsel focused on Avalos and Defendant s trial testimony that gunshots had been fired. This was obviously done in an effort to suggest that Defendant was acting in self-defense when he drove the white van onto the sidewalk and drove over Plomero. In an effort to undermine the self-defense theory offered by Defendant s trial counsel during closing argument, the prosecutor, during his closing argument, pointed out that prior to trial, neither Defendant nor Avalos had mentioned that gunshots had been fired. Furthermore, the prosecutor reminded the jury during closing argument that Defendant s trial counsel had, during closing argument, emphasized the existence of gunshots.

To this end, the prosecutor suggested that "Defendant needs those shots fired. That's why you heard it so many times" from Defendant's trial counsel during closing arguments.

After reviewing these comments in their proper context, we cannot agree with Defendant's contention that the prosecutor engaged in prejudicial misconduct such that Defendant was deprived of a fair trial. First, we believe that the redirect examination of Avalos, during which the prosecutor suggested that Avalos had recently fabricated the story that Defendant had heard gunshots fired, was a proper response to testimony provided during cross-examination. Chambers, 179 Ill. App. 3d at 577. While it would be improper for a prosecutor to suggest that a defense counsel had procured fraudulent testimony, after reviewing these comments in the context of this record as a whole, we believe that the prosecutor's intended meaning simply was that Avalos and Defendant had fabricated their story shortly before the start of trial, not that Defendant's trial counsel had solicited false testimony.

Second, we disagree with Defendant's assertions that "errors" occurred either when the prosecutor pointed out to the jury the extent to which Defendant's trial counsel had focused on the existence of gunshots being fired or the fact that the prosecutor pointed out that Defendant's trial counsel was a "professional defense attorney." We believe that the prosecutor's comments during closing argument were within the wide parameters permitted during closing arguments. Sutton, 353 Ill. App. 3d at 498. Further, any alleged errors were mitigated when the trial court both advised the jury that comments made during closing arguments are not evidence and when the trial court sustained many of the Defendant's objections. See Graca, 220 Ill. App. 3d 214. Moreover, contrary to Defendant's assertion, we do not believe that any prejudice was caused by pointing out that Defendant's trial counsel is a "professional defense attorney." We do not believe this to be an unacceptable pejorative term, and we believe that the jury understood that, just as the prosecutor was a "professional prosecutor," Defendant's trial

17

counsel was a "professional defense attorney."   See  Johnson, 208 Ill. 2d at 110.

Defendant's next argument on appeal is that his rights to confront witnesses against him and to present a defense, guaranteed by the confrontation clause of the sixth amendment to the United States Constitution, were violated.  Specifically, Defendant asserts that when Guerrero testified at trial, he claimed that he could not remember the events of either September 9, 2001, or the September 21, 2001, grand jury proceeding at which he testified.  Defendant contends that his sixth amendment rights were violated in that he was unable to cross-examine Guerrero to the extent he wished because of Guerrero's claimed lack of memory.  We disagree.

A criminal defendant's sixth amendment right to confrontation includes the right to cross-examine witnesses against him.  People v. Kliner, 185 Ill. 2d 81, 130 1998 , citing Davis v. Alaska, 415 U.S. 308, 315, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110 1974 .  Any permissible matter which affects the witness' credibility may be developed on cross-examination.  Kliner, 185 Ill. 2d at 130.  A defendant's rights under the confrontation clause are not absolute  rather,  the confrontation clause guarantees an *opportunity* for

effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Emphasis in original. *People v. Jones*, 156 Ill. 2d 225, 243-44 1993, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 1985. When the declarant appears for cross-examination at trial, the confrontation clause places no constraints at all on the use of his prior testimonial statements. Emphasis added. *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 158 L. Ed. 2d 177, 197 n. 9, 124 S. Ct. 1354, 1369 n. 9 2004. No confrontation clause problems exist simply because a declarant s alleged memory problems precluded the declarant from being cross-examined. *Mercer v.*

*United States*, 864 A.2d 110, 114 D.C. App. 2004 . On the contrary, the United States Supreme Court has held that, for purposes of satisfying the requirements of the confrontation clause

It is sufficient that the defendant has the opportunity to bring out matters as the witness bias, his lack of care and attentiveness, his poor eyesight, and even what is often a prime-objective of cross-examination, . . . the very fact that the witness has a bad memory. The ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination . . . even when the witness past belief is introduced and he is unable to recollect the reason for that past belief. *Mercer*, 864 A.2d at 114 n. 4, quoting *United States v. Owens*, 484 U.S. 554, 559, 98 L. Ed. 2d 951, 958, 108 S. Ct. 838, 842 1988 .

In the present case, during the course of a September 21, 2001, grand jury proceeding, Guerrero testified regarding the events of September 9, 2001. At trial, however, when he was called by the State to testify, Guerrero stated that he had recently been hit on the head with a shovel and, as a result, he recalled neither testifying at the September 21, 2001, grand jury proceeding nor the events of September 9, 2001. After the State attempted to refresh Guerrero's memory as to his prior testimony at the grand jury hearing, the Defendant's trial counsel cross-examined Defendant. During cross-examination, Defendant's trial counsel inquired whether Guerrero had

been offered immunity by the State in exchange for his grand jury testimony and asked Guerrero whether he had ever helped Defendant commit any crimes.  Guerrero answered Defendant's trial counsel's questions on cross-examination.  The State then offered the testimony of Assistant State's Attorney Canellis, who confirmed that she witnessed Guerrero testify under oath at the September 9, 2001, grand jury proceeding.  Defendant's trial counsel then cross-examined Assistant State's Attorney Canellis and the grand jury transcript was published to the jury.

While Defendant concedes that Guerrero appeared as a witness at trial, Defendant cites to the United States Supreme Court opinion in Crawford v. Washington in support of his argument that the extent to which he was able to cross-examine Guerrero did not satisfy the confrontation clause of the sixth amendment of the United States Constitution. *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354  2004 .   In Crawford, the Supreme Court held that the confrontation clause was violated when tape recorded statements of defendant's wife, who did not testify at trial because of a marital privilege, were offered at trial. Crawford, 541 U.S. at 59, 158 L. Ed. 2d at 197, 124 S. Ct. at 1369.  In Crawford, however, the Supreme Court confirmed the principle that  when a declarant *appears* for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.   *Emphasis added.* Crawford, 541 U.S. at 59 n. 9, 158 L. Ed. 2d at 197 n. 9, 124 S. Ct. at 1369 n. 9, citing *California v. Green*, 399 U.S. 149, 162, 26 L. Ed. 2d 489, 499, 90 S. Ct. 1930, 1937  1970 .

In light of the United States Supreme Court decision in *Crawford*, we continue to believe that a defendant s rights under the confrontation clause are not absolute  rather,    the confrontation clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in

21

whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *People v. Jones*, 156 Ill. 2d 225, 243-44 (1993), quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 (1985). This record confirms that Guerrero appeared and testified at trial, which permitted Defendant to cross-examine Guerrero and undermine his testimony by, *inter alia*, questions regarding Guerrero's criminal record; questions regarding Guerrero's inconsistent testimony; questions regarding Guerrero's drug and alcohol use on September 9, 2001; and questions regarding "the very fact that [Guerrero] has a bad memory." *Mercer*, 864 A.2d at 114 n. 4, 98 L. Ed. 2d at 958, 108 S. Ct. at 842 n. 4, quoting *Owens*, 484 U.S. at 559. Therefore, we cannot agree with Defendant's assertion that his rights under the sixth amendment of the United States Constitution were violated simply because Defendant was unable to cross-examine Guerrero to the extent that he wished.

Next, Defendant asserts that the testimony at trial from Dr. Choi, the coroner who performed a post-mortem examination on Plomero, caused Defendant substantial prejudice. Specifically, Defendant contends that Dr. Choi's testimony that the "homicide" was the cause of Plomero's death was an improper conclusion for Dr. Choi to reach. In response, the State asserts that Defendant failed to properly preserve this argument and the issue, therefore, is waived. We agree with the State.

Under Illinois law, alleged errors are waived when they are not raised both in a contemporaneous objection and in a written motion for a new trial. *Enoch*, 122 Ill. 2d at 186. In the present case, Defendant neither objected at the time that Dr. Choi offered his testimony nor objected to Dr. Choi's testimony in a written posttrial motion for a new trial. We believe that the plain error exception of Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) does not apply and, therefore, this issue is waived.

1-03-3695

Finally, Defendant asserts that the alleged errors that occurred during the course of his trial, even if insufficient to warrant reversal or a new trial when considered individually, warrant such a result when considered cumulatively. We disagree.

Individual trial errors may have the cumulative effect of denying a defendant a fair trial. People v. Speight, 153 Ill. 2d 365, 376 1992 . However, the cumulative errors that warrant such an extreme result must themselves be extreme. People v. Hall, 194 Ill. 2d 305, 350 (2000). As discussed above, the errors of which Defendant complains either were not errors or were inconsequential to his convictions. This is especially true in light of the record before us, which makes it clear that the evidence overwhelmingly supported the convictions reached by the jury. Therefore, we cannot agree with Defendant's assertion that the alleged errors, either individually or cumulatively, substantially prejudiced Defendant.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

FITZGERALD SMITH and O'MALLEY, JJ., concurring.

23