**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190252-U

Order filed May 14, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0252 Circuit No. 84-CF-74 |
| RONALD BARROW, | ) ) ) | Honorable Cynthia M. Raccuglia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'BRIEN delivered the judgment of the court.
Justices Lytton and Wright concurred in the judgment.

**ORDER**

¶ 1       *Held*:   Defendant failed to demonstrate reversible error.

¶ 2       Defendant, Ronald Barrow, appeals following the La Salle County circuit court's denial of his request for forensic testing under section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2008)). He raises numerous contentions of error. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged with first degree murder (Ill. Rev. Stat. 1983, ch. 38, ¶ 9-1(a)(1)), armed robbery (*id.* ¶ 18-2(a)), residential burglary (*id.* ¶ 19-3), and burglary (*id.* ¶ 19-1) in the February 1984 shooting death of Joseph O'Berto.

¶ 5        The facts of defendant's trial were set forth in great detail by our supreme court in *People v. Barrow*, 133 Ill. 2d 226 (1989). The State's primary witness was Harold Wrona, who had been incarcerated with defendant in Maryland prior to the O'Berto murder. Wrona recalled telling defendant about a burglary that Wrona's friend had committed in Cedar Point in 1966. Wrona's friend had found large sums of money underneath the stairs to a house and believed there was more that had not been found. Wrona conveyed to defendant other details of the home in question. On February 2, 1984, after defendant was released from custody, he visited Wrona in jail and asked him a number of questions regarding Cedar Point and the burglary that Wrona had previously described.

¶ 6        On February 24, 1984, defendant visited Wrona again, this time describing for Wrona in detail a burglary and murder he had since committed in Cedar Point. Wrona subsequently contacted authorities and agreed to wear a wire in a future encounter with defendant. That encounter occurred in April 1984, and the ensuing recording was played in court. Throughout the recording, defendant described certain details of his offense and O'Berto's house. At one point, Wrona and defendant discussed the gun that was used in the offense:

> "WRONA: *** [W]hat kind of gun was it? What kind?
>
> [DEFENDANT]: It was, um…
>
> WRONA: What caliber, I mean.
>
> [DEFENDANT]: Oh, nine.
>
> WRONA: Nine mil? Did you get rid of it?

> [DEFENDANT]: Yeah, it's gone. *** [T]hat's why I say, this job was just as clean as can be."

Later in the conversation, defendant explained that he threw the gun off a bridge on Interstate 80. He made sure that the gun went into the water.

¶ 7    Among the abundant evidence collected from the scene of the crime was a spent projectile—the bullet that killed O'Berto. Forensic scientist Robert Hunton testified that the diameter of the bullet indicated that it could have "been fired in a gun of 380, 9 millimeter, .38 special, [or] 357 magnum size." Each of those types of firearms has the same bore diameter. Further, the rifling pattern on the bullet indicated that the weapon that fired it was either a Smith & Wesson, a Ruger, or an I.N.A. Hunton testified that Smith & Wesson made a 9-millimeter revolver as well as a 9-millimeter semi-automatic. Either of those firearms could have fired the found bullet. He could not say with any certainty what kind of gun was used, because no gun was recovered.

¶ 8    On cross-examination, defense counsel asked Hunton: "Backing up now to the weapon. You did examine a couple of particular weapons, didn't you?" The State objected and, outside of the presence of the jury, explained:

> "Your Honor, I believe [defense counsel] is going to make inquiry of a number of guns that were submitted and checked, and came back as totally inconclusive, or weren't used in the crime. I believe there's one in particular that came back as an inconclusive result. The problem with [defense counsel's] question, is that there's absolutely no evidence whatsoever to connect that weapon with this crime.

And, in fact, the individual who the weapon was taken from, in fact, fingerprints were checked, came back as none were indicated that he was at the scene of this particular crime."

Defense counsel responded: "Rather than get way off base, I wasn't heading in that direction. I have no intention of trying to link up the Sam's Pizza Armed Robbery which I believe [the State] is referring to." The court sustained the objection.

¶ 9 The jury ultimately found defendant guilty on all counts and found him eligible for the death penalty. The death penalty was originally imposed, but that sentence was later commuted to life imprisonment. His convictions were affirmed by our supreme court. *Barrow*, 133 Ill. 2d 226.

¶ 10 In 2008, defendant commenced proceedings under section 116-3 of the Code. Among defendant's requests for forensic testing was a request for DNA testing on "all blood, hair and saliva evidence recovered from the crime scene." Defendant also sought Integrated Ballistic Identification System (IBIS) ballistics testing on the spent "projectile that killed the victim" as well as "all evidence relating to Laboratory Case No. J84-468, Exhibit 19, [ ]one Smith & Wesson model 65-1, 357 Magnum caliber revolver."

¶ 11 Through subsequent filings and court appearances, defendant clarified that the .357 caliber revolver referenced in his motion was a ".357 magnum seized from suspect Robert G. Venturi *** in the armed robbery of Sam's Pizza on or about February 18, 1984, near the time and home of victim Mr. Joseph O'Berto." Moreover, defendant was not seeking testing on the firearm itself; rather, he requested that the test shot fired from that gun—"test shot 23 TS"—be entered into the IBIS database. Defendant also supplied a copy of the 1984 forensic report authored by Hunton and alluded to by the State and defense counsel at defendant's trial. The report shows that Hunton

4

tested a Smith & Wesson magnum caliber revolver and that "no positive identification or elimination was made" with respect to the spent projectile found at the scene of the murder.

¶ 12    In 2009, the circuit court issued an order denying some of defendant's requests while granting others. With respect to defendant's other requests, the court directed the State to conduct further investigation into whether certain items were available and suitable for forensic testing. For instance, the order stated: "State shall examine evidence vault and investigate file again for the existence of hair and fiber evidence, and provide affidavit to the court regarding existence of same." That 2009 order made no reference to the ballistics testing sought by defendant. However, a 2010 order entered upon denial of defendant's motion for reconsideration stated: "State to provide affidavit regarding hair, fiber, & firearm evidence." This court affirmed the denials of defendant's requests for forensic testing. *People v. Barrow*, 2011 IL App (3d) 100086.

¶ 13    While defendant's appeal was pending, and after it was decided, defendant's unresolved requests for forensic testing remained pending in the circuit court. In 2013, the State filed a motion to close the proceedings, asserting that all of the forensic testing that could be conducted had been conducted, with the results turned over to defendant. Specifically, the State declared that ballistics testing had been performed on a single spent projectile found at the scene. A report from Hunton indicated that the spent projectile found at the scene of the crime had been entered into IBIS on February 13, 2013, with a result of "No ID's."

¶ 14    Defendant acknowledged receipt of Hunton's report. However, he argued that the report only partially addressed his request for testing. He insisted that testing had been ordered on two projectiles, and that one therefore remained to be tested. Defendant also pointed out that the State had not provided any affidavit related to the hair and fiber evidence. The circuit court granted the motion to close.

5

¶ 15     On appeal from that ruling, defendant argued, *inter alia*, that the judgment was erroneous because ballistics testing had not been conducted on the test shot fired from the firearm found in an unrelated case. *People v. Barrow*, 2016 IL App (3d) 130622-U, ¶ 25. This court found that the question of whether testing should be conducted on the test shot had never been addressed, and that closure of the proceedings had thus been premature. *Id.* ¶ 36. This court further noted:

"[W]e emphasize that we are not remanding for forensic testing on the .357 projectile marked 'test shot 23 TS.' We are merely remanding so that the trial court may issue a ruling on defendant's request for comparative forensic testing on the .357 projectile marked 'test shot 23 TS.' " *Id.* ¶ 38.

¶ 16     On remand, on July 7, 2017, defendant raised the topic of hair and fiber evidence, asserting that the State had also been ordered to provide an affidavit relating to testing of those items. The State countered that the hair and fiber evidence, and the affidavit relating thereto, was outside the scope of this court's remand. The court agreed with both parties. It acknowledged that it had ordered the State to provide an affidavit relating to the hair and fiber evidence, and that it had not ensured that the affidavit was provided before originally closing the proceedings. The court also agreed that the matter was only before the court for a "limited purpose," that being a ruling on the ballistics comparison. Ultimately, the court concluded that it would "make sure" that the hair and fiber affidavit was filed.

¶ 17     Defendant subsequently filed a "Motion to Reinstate Order for Ballistic Testing," in which he requested that testing be ordered on the test shot. Defendant also filed a "Motion to Compel Production of Affidavit" in which he requested that the State be ordered to produce an affidavit relating to "ballistic, hair, and fiber" evidence. Defendant pointed out in his motion that the State had previously been ordered to file such an affidavit. Finally, defendant filed a "Supplemental

6

Section 116-3 Motion for Testing," in which he requested that previously tested fingerprint evidence be submitted to additional testing.

¶ 18    The State filed a response to defendant's collective motions. It first asserted that the only issue before the circuit court, per this court's mandate, was the ballistics testing on the test shot. On that point, the State averred that a fired projectile could not be entered into the IBIS database. The State attached to its response an affidavit from forensic scientist Dan Gunnell attesting to that fact.

¶ 19    On August 10, 2018, the circuit court set the matter for a hearing on October 26, 2018. Defendant subsequently filed a "Motion for Release of Evidence upon Death for Post-Mortem Testing." In the motion, defendant sought the release of all the evidence in his case pursuant to section 116-4(c) of the Code. See 725 ILCS 5/116-4(c) (West 2018).

¶ 20    On October 1, 2018, the State filed a motion to continue. In that motion, the State averred that it intended to arrange for both Gunnell and Hunton to testify at the hearing, but Gunnell would be unavailable on the scheduled date. In his response, defendant did not object to a continuance but noted in his response that he was presently attempting to prevent a transfer out of Menard Correctional Center.

¶ 21    The circuit court entered an order granting the continuance on October 17, 2018. The hearing was set for December 13, 2018.

¶ 22    On November 20, 2018, defendant filed a motion indicating that he had been transferred to Stateville Correctional Center. Defendant explained in the motion that he had not received a copy of any ruling on the State's motion for a continuance or otherwise setting a new date for the hearing. He requested that a copy of that order be provided.

7

¶ 23 On December 8, 2018, defendant wrote a letter to the La Salle County circuit clerk, again inquiring as to when his rescheduled hearing would be held. The letter was received and file-stamped on December 13, 2018.

¶ 24 On December 13, 2018, defendant addressed a letter to the circuit court in which he stated that he learned for the first time at 7:30 a.m. that he was to appear in court that day. He asked that the witnesses be contacted and told not to appear and for the hearing to be rescheduled. He indicated that if such a step was not possible, he wished to proceed rather than give up his opportunity to question those witnesses.

¶ 25 In court that day, defendant informed the court that, due to his prison transfer and lack of access to certain materials, he was not fully prepared to question Gunnell and Hunton. The circuit court reviewed the history of the case in detail, then asked why defendant "would *** need any more preparation to question these witnesses." Defendant explained that he was only allowed a certain amount of property in his prison cell at one time, and he had been focused on two civil cases he had pending. He added: "[D]on't get me wrong, I'm ready to proceed with these witnesses and I will get in as much as I can get in."

¶ 26 Before the hearing commenced, defendant again asserted that the State had never produced an affidavit relating to potential hair and fiber evidence. The court acknowledged that it had previously suggested that it would require production of the affidavit. But, the court concluded, "it is my position that [the appellate court] remanded solely for the purpose of the testing of the second [projectile], whether it can be done, on the firearm. Period. So that's what we are proceeding on." Defendant countered that even if the remand was limited, there was no limit on the number of motions he could file under section 116-3 of the Code, such that he was free to request hair and fiber testing anew. The State argued that if defendant wished to file a new motion, he should not

8

be allowed to bootstrap that request to the present proceedings. The court agreed with the State, suggesting that any issues aside from the ballistics testing would need to be raised in a new motion and considered in a separate proceeding.

¶ 27        During the hearing, Gunnell testified that he was the assistant laboratory director of the Joliet forensic science laboratory. He explained that IBIS is a database of digitalized 3D images of cartridge cases. When a discharged cartridge case is found, it is entered and run through the database. Gunnell testified that IBIS does not make an identification *per se*, rather, it may provide a ranking of similar cartridge cases "so we can see if we need to pull that evidence back and compare it." If IBIS turns up a similar cartridge case, Gunnell testified, "we will call back the physical evidence and that will be compared *** utilizing traditional comparison microscope techniques."

¶ 28        Gunnell testified that the present iteration of IBIS did not support the entry or comparison of spent projectiles. As of some time in 2013, the system was used only for the comparison of cartridge cases. Prior to that point, IBIS testing on spent projectiles resulted in a nationwide success rate so low that such testing was deemed impractical. Gunnell explained that due to the inherent mutilation to a fired bullet, an automated system for the comparison of the markings on such projectiles was so difficult as to be considered "the holy grail of forensic sciences and firearms." Defendant inquired as to whether the test shot bullet could be entered into the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) National Integrated Ballistic System. Gunnell responded that he was not familiar with the ATF's submission guidelines and that the question was outside the area of his expertise.

¶ 29        During his direct examination of Gunnell, defendant questioned Gunnell at length regarding Gunnell's testimony in a 1993 case, as well as his more recent testimony in

9

postconviction proceedings in the same case. Throughout his questioning, defendant produced and submitted multiple exhibits to the court. The court commented: "See, I believe, and I'm making a record of it, that you've been prepared for this day from the very beginning. That's what I believe and I think the record shows that."

¶ 30    Hunton testified that he entered the fired bullet found at the scene of the crime into the IBIS database in 2013. He affirmed that "no identification was made." He explained that if the database search had revealed another image "that looked good," he would procure that other evidence and conduct a side-by-side comparison. Hunton also recalled performing a test shot from the .357 magnum in 1984, and comparing that bullet to the bullet found at the scene of the crime. He reiterated that no positive identification or elimination had been made. He added: "[T]here were not sufficient individual characteristics to say that this particular bullet was fired from that particular gun."

¶ 31    Like Gunnell, Hunton testified that bullets were no longer entered into IBIS, and he did not know that doing so would even be possible currently. Hunton testified that IBIS was no longer used with bullets because "very seldom would you get a hit off of a projectile." IBIS stopped accepting bullets some time very soon after Hunton entered the found bullet into the database in February 2013.

¶ 32    Following the above testimony, defendant requested that the court stay its ruling for 60 days and allow him to file a "follow-up brief" along with exhibits that he had left at the prison that day. Citing defendant's allegation that he had been unaware of the hearing until that day, the court granted his request, adding: "Now, while I feel that you knew what you were doing to question these witnesses and I do believe you've been ready for this for a long time, actual exhibits you can't manufacture out of the blue ***."

¶ 33       Defendant then once again raised the issue of the hair and fiber evidence, stating: "[I]f I have to file another motion that's not a problem but I currently have pending with this Court a supplement to the 116-3 [motion]." The court reiterated that it would hear any of defendant's motions, but only after it had complied with this court's mandate.

¶ 34       Defendant subsequently filed a brief on the issue as well as a "Motion to Produce Relevant Evidence at May 2[,] 2019 Hearing" (motion to produce evidence). In the motion, defendant requested that the test shot, the box the test shot was stored in, the .357 caliber revolver that fired the test shot, and the "investigative police file" be produced at the upcoming hearing. He alleged, *inter alia*, that he was "entitled to review the 'gun' in order to clearly establish the record for appellate review." In the State's response to the motion, it argued that the physical appearance of neither the test shot projectile nor the box it was stored in was relevant to his request for ballistics testing. The court denied the motion.

¶ 35       The parties reconvened on May 2, 2019. After further arguments, the court denied defendant's request for ballistics testing on the test shot, commenting that Gunnell and Hunton had testified credibly. The court also denied defendant's motion for release of evidence upon death.

¶ 36                                    II. ANALYSIS

¶ 37       Defendant has elected to proceed as a self-represented litigant on appeal. He raises the following nine contentions of error: (1) the instant appeal should be transferred to a different district of the appellate court; (2) the court erred in denying his request for ballistics testing on the test shot projectile; (3) defendant was deprived of procedural due process where he never received notice of the final hearing on his motion; (4) the court erred in declining to consider his additional requests for testing on remand; (5) the court erred in failing to enforce its prior order directing the State to produce an affidavit relating to hair and fiber evidence; (6) the court erred in denying his

11

motion for release of evidence upon death; (7) the court erred in denying his motion to produce evidence; (8) the State engaged in a pattern of prosecutorial misconduct; and (9) section 116-3 of the Code is unconstitutional as applied to him. We affirm.

¶ 38                                      1. Change of Venue

¶ 39        Defendant first argues that a change of venue is required for this appeal "based on such prejudice against appellant upon the appearance of bias by this court evident by two (2) previous decisions rendered."

¶ 40        Initially, we note that defendant has failed to cite any legal authority that supports the notion that his appeal should be transferred or that any individual member of this court should recuse themselves. See *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 ("[T]his court is not a repository into which an appellant may foist the burden of argument and research.").

¶ 41        Defendant's argument is largely framed as a dispute with this court's conclusions in his prior appeals. See *Barrow*, 2011 IL App (3d) 100086; *Barrow*, 2016 IL App (3d) 130622-U. Beyond his own disagreement with those dispositions, defendant has failed to identify any words or actions that tend to show any bias or impartiality on the part of any member of this court. Nor does our own review of those cases reveal any such objectionable content. Indeed, it should be pointed out that defendant prevailed in part in his most recent appeal, in which he also proceeded as a self-represented litigant. *Barrow*, 2016 IL App (3d) 130622-U, ¶ 36.

¶ 42        Finally, defendant asserts that because his offense occurred in Ottawa, and both the circuit court and this court sit in Ottawa, there are "grave concerns for *** possible prejudice" toward him. Again, this argument is unsupported by any legal citation. Likewise, we are unaware of any support for the position that an appellate court may not hear cases arising in the locale in which it

sits. In sum, defendant has made no showing of actual bias or even the appearance of bias on the part any member of this court. We therefore deny his request for change of venue.

¶ 43                                   2. Ballistics Testing

¶ 44        Defendant next argues that the circuit court erred in denying his remaining request for ballistics testing.

¶ 45        Section 116-3 of the Code allows a convicted defendant to move "for the performance of fingerprint, [IBIS], or forensic DNA testing, *** on evidence that was secured in relation to the trial or guilty plea which resulted in his or her conviction." 725 ILCS 5/116-3(a) (West 2008). Testing will be granted where the circuit court determines that:

> "(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant; [and]
>
> (2) the testing requested employs a scientific method generally accepted within the relevant scientific community." *Id.* § 116-3(c).

We review the circuit court's denial of defendant's motion for forensic testing *de novo*. *People v. Perez*, 2016 IL App (3d) 130784, ¶ 20.

¶ 46        Both Gunnell and Hunton testified that bullets were no longer entered for comparison in the IBIS database. As Gunnell and Hunton explained, IBIS is currently only used for cartridge case comparisons because bullet comparisons so rarely produced meaningful results. Gunnell explained that this low success rate was due to the inherent mutilation incurred by a fired bullet. Even assuming that section 116-3 would allow for the entry of a bullet into a non-IBIS database, the lack of success of such a search with respect to fired bullets, as describe by Gunnell and Hunton,

13

tends to show that the potential of producing materially relevant evidence through IBIS testing of the test shot bullet would be especially low.

¶ 47    On a more fundamental level, the specific testing requested by defendant is necessarily unlikely to yield probative results. The record establishes that the .357 magnum revolver in question was seized in an entirely unrelated case. Hunton conducted a direct comparison test of the test shot bullet from that firearm and the spent projectile found at the scene of defendant's crime, with inconclusive results. Even if the test shot bullet could be entered into IBIS or an IBIS-like database, and that search showed that the .357 magnum revolver had been used in another offense, such a result would have absolutely no bearing on defendant's claim of actual innocence. It would merely connect one unrelated offense with another unrelated offense.

¶ 48                    3. Procedural Due Process

¶ 49    Defendant next argues that he never received a copy of the court's order granting the State's motion for continuance and setting the hearing on his remaining request for forensic testing for December 13, 2018. He maintains that he only learned that the hearing was to take place early on the morning of the hearing itself. He contends that he was denied a meaningful opportunity to be heard and was thus deprived of procedural due process. A procedural due process claim presents a question of law, which we review *de novo. People v. Stoecker*, 2020 IL 124807, ¶ 17.

¶ 50    An individual's right to procedural due process "entitles an individual to 'the opportunity to be heard at a meaningful time and in a meaningful manner.' " *Id.* (quoting *In re D.W.*, 214 Ill. 2d 289, 316 (2005)). "Procedural due process claims challenge the constitutionality of the specific procedures used to deny a person's life, liberty, or property. [Citation.] The fundamental requirements of due process are notice of the proceeding and an opportunity to present any objections." *People v. Cardona*, 2013 IL 114076, ¶ 15.

14

¶ 51    Even assuming, *arguendo*, that the above facts amount to a violation of defendant's right to due process, any such violation was unquestionably harmless. A strong presumption exists that errors of a constitutional magnitude are subject to harmless error analysis. *People v. Averett*, 237 Ill. 2d 1, 13 (2010). Where defendant was on notice generally that his hearing was approaching— and had been so aware for a number of months—we cannot say that any error is so serious as to "necessarily render the proceedings automatically unfair or unreliable." *Stoecker*, 2020 IL 124807, ¶ 25 (holding that the procedural due process claim did not amount to structural error, and was thus subject to harmless error analysis).

¶ 52    Even accepting as true the assertion that defendant did not learn about the December 13, 2018, hearing until that morning, it is difficult to discern any prejudice he suffered. First, the hearing on his request for ballistics testing was originally scheduled by the court on August 10, 2018. Defendant was ultimately given more than four months to prepare for the hearing. That preparation time was on display at the hearing itself. The record shows that defendant conducted extensive and detailed examinations of Gunnell and Hunton, including production of exhibits. Even the court commented on defendant's performance and preparation. Furthermore, in an effort to cure any potential prejudice defendant may have suffered, the court granted his motion to stay its ruling, allowing defendant to file further briefing on the issue. It was not until the following May that the court denied defendant's motion. Accordingly, we find that any procedural due process violation with regard to notice of the December 13 hearing was harmless.

¶ 53                              4. Other Testing Requests

¶ 54    Defendant next argues that the circuit court erred in declining to address his requests for hair, fiber, and fingerprint testing. He also frames this issue as a deprivation of procedural due process.

15

¶ 55    A circuit court retains a traditional right of discretionary control over its own docket. *E.g.*, *Oldenstedt v. Marshall Erdman & Associates, Inc.*, 381 Ill. App. 3d 1, 15 (2008). In this case, defendant filed his original motion under section 116-3 of the Code in 2008. This court remanded the matter in 2016 with instructions that the circuit court address the lone request that remained pending from that motion. *Barrow*, 2016 IL App (3d) 130622-U, ¶ 36. We cannot say that the circuit court's decision to complete those pending proceedings before addressing additional requests was an abuse of its discretion.

¶ 56    We also note, as did the circuit court, that there is no statutory limit to the number of motions that may be filed under section 116-3 of the Code. See *People v. Bailey*, 386 Ill. App. 3d 68, 72 (2008) ("There is no language in section 116-3 indicating that the legislature intended to limit the number of motions for forensic testing that a defendant could file. If the legislature had wished to impose such a limit, it could have easily done so."). Thus, the court's discretionary decision to limit remand proceedings to the remainder of the 2008 motion was necessarily of no prejudice to defendant, as he remains free to file a motion raising additional requests for testing.

¶ 57                                    5. Hair and Fiber Evidence

¶ 58    Defendant next argues that the circuit court committed error in failing to enforce its 2009 order requiring the State to produce an affidavit relating to the availability for testing of certain hair and fiber evidence. See *supra* ¶ 17. He insists that the production of that affidavit was contemplated by this court's 2016 mandate.

¶ 59    Defendant's assertion with respect to this court's mandate is incorrect. In his 2016 appeal, we wrote:

    "Based on this record, we agree the court's 2013 order closing proceedings
    was premature. Defendant's 2012 request to compel testing on the .357 projectile

16

has not yet been ruled upon. Accordingly, we reverse the trial court's order closing proceedings and remand for resolution of defendant's request for ballistics testing.

*&ast;*

Finally, we emphasize that we are not remanding for forensic testing on the .357 projectile marked 'test shot 23 TS.' We are merely remanding so that the trial court may issue a ruling on defendant's request for comparative forensic testing on the .357 projectile marked 'test shot 23 TS.' " *Barrow*, 2016 IL App (3d) 130622-U, ¶¶ 36-38.

While the hair and fiber affidavit was referenced in the fact section of our order, the mandate for remand plainly did not call for any action with respect to that affidavit.

¶ 60 Furthermore, the circuit court entered an order in 2013 declaring the proceedings closed. In the subsequent appeal, defendant did not raise the issue of the hair and fiber affidavit. See *id.* ¶ 25.

"The rule is that no question which was raised or could have been raised in a prior appeal on the merits can be urged on subsequent appeal and those not raised are considered waived. [Citations.] *&ast;*&ast;* In such a case it is presumed that appellant has no objections to urge against the record except those which have been presented and he will not be permitted to assign such errors on a second appeal." *Kazubowski v. Kazubowski*, 45 Ill. 2d 405, 413-14 (1970)

Accordingly, defendant was barred by the doctrines of waiver and law-of-the-case from raising the issue and is similarly barred from raising the issue here. *People v. Brown*, 2017 IL App (2d) 160971, ¶¶ 23-24 (explaining that law-of-the-case doctrine applies, rather than *res judicata*, on second appeal following earlier remand).

17

¶ 61     To be sure, we recognize that the circuit court initially indicated on remand that it would "make sure" the State produced the hair and fiber affidavit. However, we need not decide whether the court was barred from taking such a step—either jurisdictionally or doctrinally—because it later reconsidered its decision and elected to proceed only on the requirements of this court's mandate. See *supra* ¶ 26.

¶ 62                         6. Motion for Release of Evidence Upon Death

¶ 63     Defendant next asserts that the court erred in denying his motion for release of evidence upon death, purportedly filed pursuant to section 116-4(c) of the Code.

¶ 64     Section 116-4(a) mandates that law enforcement agencies retain, before and after trial, any physical evidence reasonably likely to contain forensic evidence. 725 ILCS 5/116-4(a) (West 2018). Section 116-4(c), in turn, provides:

> "After a judgment of conviction is entered, the law enforcement agency required to retain evidence described in subsection (a) may petition the court with notice to the defendant or, in cases where the defendant has died, his estate, his attorney of record, or an attorney appointed for that purpose by the court for entry of an order allowing it to dispose of evidence ***." *Id.* § 116-4(c).

¶ 65     Clearly, section 116-4(c) creates a method by which a law enforcement agency may move to dispose of evidence in its possession. It does not authorize or even contemplate any motion to be filed by a defendant himself. It follows that the circuit court properly denied defendant's motion.

¶ 66                               7. Motion to Produce Evidence

¶ 67     Defendant next argues that the circuit court erred in denying his motion to produce evidence. We note that defendant has failed to cite any specific grounds on which that motion should have been granted. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Even in the original

18

motion, defendant did not present any cogent explanation as to how the production of the evidence in question would impact the court's ruling on his motion for forensic testing. As the State pointed out in its response, the physical presence of the evidence in the courtroom for the delivery of the court's ruling was simply irrelevant. We agree and find that the court did not abuse its discretion in denying the motion.

¶ 68                                    8. Prosecutorial Misconduct

¶ 69        Defendant next argues that the State engaged in a pattern of prosecutorial misconduct. Defendant's allegations, however, are nothing more than unsupported assertions that the State lied at various points in the proceedings or that the State was responsible for the delay in the proceedings. Moreover, defendant has failed to make even an allegation of prejudice flowing from the purported misconduct. See *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006). Accordingly, we find that defendant has failed to demonstrate reversible error.

¶ 70             9. Unconstitutionality of Section 116-3 as Applied to Defendant

¶ 71        Finally, defendant argues that section 116-3 of the Code is unconstitutional as applied to him. This argument, however, is also barred by the doctrines of waiver and law-of-the-case, as defendant could have raised it in his prior appeal. See *supra* ¶ 60. We note that defendant did *attempt* to raise the issue in his earlier appeal, but this court determined that the issue was forfeited by defendant's failure to properly develop the argument or cite to any authority in support thereof. *Barrow*, 2016 IL App (3d) 130622-U, ¶¶ 44-45. Whether the issue is considered to have been raised in that appeal or not raised, however, the result is the same: defendant is precluded from raising it now. *Kazubowski*, 45 Ill. 2d at 413-14.

¶ 72                                        III. CONCLUSION

¶ 73        The judgment of the circuit court of La Salle County is affirmed.

19

¶ 74     Affirmed.