2022 IL App (1st) 191616-U
No. 1-19-1616

FIRST DIVISION
June 13, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15 CR 13171 |
| | ) | |
| SHAWN RANDALL, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Erica L. Reddick, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justice Coghlan concurs in the judgment.
Presiding Justice Hyman specially concurs, with opinion.

**ORDER**

¶ 1    *Held:* Judgment affirmed over defendant's challenge to the admissibility of gang evidence where the trial court did not abuse its discretion in allowing the State to present the gang evidence because the State properly established the lay witness' personal knowledge. The prosecution also established that the prosecution witness had "personal knowledge" of the gang evidence in order to allow for its admission as prior inconsistent statements. The introduction of multiple prior consistent statements was proper as it constituted prior consistent statements of pretrial identification testimony. Defendant was not denied his right to a fair trial by the State's comments during closing and rebuttal arguments. Defendant also did not establish that he was prejudiced by the cumulative effect of these claims.

¶ 2    Defendant, Shawn Randall, was convicted of first degree murder and personally discharging a weapon during the commission of this offense for the shooting death of Vallen Francis (Francis). Defendant asserts that he was denied his right to a fair trial when (1) the State presented prejudicial gang evidence where the State failed to establish the lay witness' personal knowledge; (2) the State presented repetitive prior consistent statements of pretrial identification testimony; (3) the State made several improper comments during closing and rebuttal arguments; and (4) by the cumulative effect of these errors. For the foregoing reasons, we affirm defendant's conviction.

¶ 3                                    BACKGROUND

¶ 4    In 2015, Francis was shot to death by a man who first rode by him on a bicycle and returned on foot to shoot him in front of his apartment building in Chicago. The shooting was witnessed by Keisha LeFlore (Keisha), Francis' live-in girlfriend and the mother of his three children. Immediately after the shooting, a bicycle was recovered nearby, and defendant's DNA was recovered from the rubber handgrip and the brake levers of this bicycle. A security camera attached to a nearby building also captured defendant enter a nearby alley riding a bicycle, and then seconds later, run quickly back down the alley and away from the area of the shooting. Defendant was arrested four days later and charged with first degree murder in the shooting death of Francis.

¶ 5    Prior to trial, the State filed a motion to admit gang crime evidence in which it sought to introduce evidence that (1) defendant belonged to the Pooh Bear street gang, (2) Francis was a member of the Loc City street gang, and (3) there was an ongoing feud between these two gangs. The State argued that Keisha would provide this testimony as a lay witness, that the State would be able to provide the proper foundation based on her own personal knowledge, and that this gang evidence was admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. Defendant filed a response to the State's motion to admit gang crimes

evidence in which he argued that this evidence would constitute "inadmissible hearsay" and "if covered by any exception to that rule…[this evidence] would violate the best evidence rule." Defendant further argued that the State would be required to show the relevance of the evidence of gang affiliation and that its probative value was outweighed by its prejudicial effect.

¶ 6      At the hearing on the motion, the State argued that Keisha LeFlore would be able to identify defendant as a member of the Pooh Bear street gang based upon a statement that Francis made to her prior to the shooting in which he identified defendant as a member of this gang,[1] as well as viewing defendant's Facebook positing in which he identified himself as a member. She also knew him from seeing him in the neighborhood a couple of times. Also, based upon her relationship with Francis, she was aware of his gang affiliation and that there was an ongoing feud between these two gangs. In addition, the State argued that this evidence was relevant to explain the motive for the shooting and identification of the shooter. The State also indicated that it might seek to introduce the testimony of a gang expert.

¶ 7      In response, defendant argued there was insufficient evidence to establish that the gang evidence is related to this specific crime. Defendant also argued, "What we have here, Judge, is Ms. LeFlore saying that she knows something about [defendant] only from Facebook, not what [defendant] did but from what people told her…" He reiterated his argument that this gang evidence was not relevant and overly prejudicial.

¶ 8      In granting the State's motion, the trial court recognized that gang evidence is admissible as long as it is relevant to the crime charged and its probative value is not substantially outweighed

---

[1] Ultimately, the trial court rejected the State's request to introduce Francis' statement to Keisha, after seeing defendant ride past them on the bicycle, in which Francis identified defendant as "Lil Shawn from the other side of town." The trial court rejected the State's argument that it constituted an excited utterance.

by its prejudicial effect. The trial court found that the State had established the relevance of the gang evidence and its probative value substantially outweighed any prejudice. As to defendant's concerns that the testimony regarding the Facebook posting would be based upon hearsay where it would consist of statements from other people, the trial court stated, "with respect to someone else testifying about what's contained in a Facebook posting, if the intention is to introduce it through some specialized knowledge, a witness with specialized knowledge, that would cure concerns as to the evidence coming in through that witness relying upon hearsay."

¶ 9      At trial, the State presented the testimony of Keisha LeFlore (Keisha), Chicago Police Detectives Rolando Rodriguez, Adam Katz and John Fuller, Assistant State's Attorneys Craig Engebretson (ASA Engebretson) and Jennifer Cooper (ASA Cooper), as well as witnesses related to DNA evidence recovered from a bicycle near the scene and a videotape captured by a security camera attached to a nearby building. In July of 2015, Keisha, Francis, and their three children lived at 2018 West Arthur, Chicago. At 1:30 p.m., on July 15, 2015, Keisha and Francis were in front of their apartment building as their children played ball and rode bicycles. She noticed someone riding a bicycle in front of them. This person was riding eastbound along Arthur Street before turning right onto Seeley Street, in the direction of an alley behind her apartment building. At trial, she described the cyclist as an African American man wearing white shorts, a long-sleeved blue shirt and had a braided hair that was "dipped into a different hair color" at the end. After seeing the cyclist, she and Francis prepared to gather their things and take the children inside. At that point, Keisha heard four to five gunshots coming from the side of the building closest to Damen Avenue, and then saw Francis had been shot. She took her children inside and had Francis' sister call 911. Francis was transported via ambulance to Saint Francis Hospital where Keisha later

learned that Francis had died. The subsequent autopsy revealed that Francis died as a result of multiple gunshots wounds and the manner of death was homicide.

¶ 10    Keisha made an in-court identification of defendant. Although she did not personally know defendant, she recognized him from his Facebook page, and his name on Facebook was Shawn Randall, also known as "Little Shawn." She had also seen defendant's rap music videos on Facebook. She had also previously seen him in person twice. She further testified that she "did not know for sure" if defendant was a member of the Pooh Bear gang. When asked if she told the police that the defendant was a member of that gang, she testified that "I told them I believe he was." Keisha knew Francis belonged to the Loc City gang because of his gang tattoo. She was also aware of gang activity in the area where they lived where she saw "a lot of arguing back and forth…" between the Loc City gang and the Pooh Bear gang. However, she was unaware of any violence or shooting between these two gangs.

¶ 11    While Keisha was at the hospital, she was interviewed by Chicago Police Detectives Rolando Rodriguez and Nick Xanos. Detective Rodriguez testified that Keisha told him and his partner that she and Francis were in front of their home when she saw a person she knew as Little Shawn riding a bicycle westbound on Arthur Street. Keisha, Francis and their children were preparing to go inside when Francis and her son, Vallen Francis, Jr., stopped to pick up their daughter's bicycle. Keisha told them that she saw Little Shawn come around the corner of the building holding a big, black handgun. She saw Little Shawn fire that gun three or four times at Francis. She described Little Shawn as an 18-year-old black male, 5" 10' to 6 feet tall, 135 to 140 pounds, dark complected, dreadlocks with brown tips, and wearing a dark hooded jacket. At the time of the shooting, Little Shawn wore the hood over his head, but she could still see his dreadlocks and his face. At trial, Keisha denied the substance of this statement, testified that she told the detectives at

the hospital that she "believe[d]" that the shooter was Little Shawn, and described the shooter as 20 to 21 years old, 5" 7' tall, and 145 pounds. She denied that she told the detectives at the hospital that Little Shawn belonged to a rival gang that hangs out on Farwell Street, and that this gang was currently at war with the gang from Howard Street. She further denied that she told these detectives that she had seen Little Shawn numerous times on Facebook, that Little Shawn's Facebook profile name is Shawn Randall, and that defendant requested to be her friend on Facebook.

¶ 12      Keisha agreed to accompany the detectives to the police station to assist in the investigation. Chicago Police Detective Adam Katz, a detective who had no previous involvement in the investigation, showed a photo array to Keisha. Keisha agreed to have this procedure videotaped and audiotaped. Prior to showing her the photo array, no one told her which photo to identify. Detective Katz testified that Keisha did not hesitate when she identified a photograph of defendant as the person who shot the victim. Keisha testified that she told Detective Katz that she "believe[d]" that defendant was the shooter. She admitted that she put her initials below defendant's photograph. The videotape recording of Keisha viewing the photograph array was admitted into evidence and published to the jury.

¶ 13      Meanwhile, at the scene of the shooting, the police continued their investigation and gathered evidence. The police found a bicycle leaning against the wall of an apartment building, hidden behind a dumpster in an alley behind 6521 North Seeley. The bike was unlocked, in good condition and its tires were not flat. The bike was swabbed for the presence of DNA. Defendant's DNA was found on the rubber handgrip and the brake levers of this bicycle. During their investigation, the police also recovered a security videotape from a nearby building showing the alley behind the apartment building, which was admitted into evidence and published to the jury.

¶ 14     Defendant was arrested for this shooting on July 19, 2015, at 6:35 a.m. Later that evening, the police asked Keisha to return to the police station. Chicago Police Detective John Fuller showed Keisha the videotape security footage. While Keisha denied that she identified anyone from that videotape, she testified that she told the detectives that she "believed" that this was the same person who shot Francis.

¶ 15     After viewing the videotape, Keisha met with ASA Engrebretson and was willing to speak with him about the shooting. Outside the presence of any police officers, Keisha told ASA Engrebretson that she did not have any complaints about how the police had treated her. She consented to providing a videotaped statement. In that videotaped statement, she stated that around 1:30 p.m. she was in front of her home when she saw Little Shawn ride past on a bicycle. She knew Little Shawn from Facebook and had previously seen him in person but had never conversed with him. She knew he was a member of the Pooh Bear street gang based on seeing him before. At that time, Little Shawn was wearing a white shirt with black or dark-colored pants, and white shoes. She then turned around and saw Little Shawn wearing a black hoodie tightened around his face. While the hoodie covered part of his face, she could still see his eyes, nose and his dreadlocks sticking out of the top of the hoodie. She saw him shoot Francis five times with a black handgun. She did not see anyone else out there with a gun. She was previously shown a videotape recording from a nearby alley, and she recognized defendant in the videotape as the person riding a bicycle and running back on foot from the alley. During the interview, she signed three still photographs taken from the video recording and identified them as defendant. At trial, Keisha admitted that she identified someone in these three still photographs, but she stated that she told ASA Engrebretson that she "believed" it was defendant. She remembered telling him that she was friends with defendant on Facebook and he requested to be her "friend." Keisha admitted that she told ASA

Engrebretson that, on Facebook, defendant spoke "about the things he was involved with, including the gang that he was part of…" The State introduced portions into evidence of the videorecording of her interview with ASA Engrebretson and published it to the jury.

¶ 16      Keisha testified that she agreed to give a videotaped statement to ASA Engrebretson. She further admitted that she told him that defendant rode his bike along Arthur from Damen towards Seeley Avenue, and that approximately eight minutes later, she saw him again. However, at trial she denied that she told ASA Engrebretson that defendant shot Francis in front of her. She admitted that she told him that defendant was wearing a black hoodie, which was unusual because it was a hot day, and after the shooting, defendant ran towards Seeley Avenue. She further admitted that she went to the hospital after the shooting where she gave a name and clothing description of the shooter to the police officers.

¶ 17      She did not remember telling ASA Engrebretson that she knew it was defendant because she had seen him before, that there was nothing blocking her view, and that she turned around and saw defendant wearing a hoodie when he returned to the street. She also did not remember telling him that the hoodie was black and tightened around his face, but that she could still see his eyes, nose, and some dreadlocks sticking out of the top of the hood. She further did not remember telling him that defendant shot Francis five times, that the gun was a black handgun, and that she demonstrated how defendant held the gun. At the close of her testimony, Keisha explained that no one told her who to pick out from the photograph array, but "just felt like I was basically taken advantage of with…everything from the beginning I explained to them that I never saw his face and…they took advantage of me being vulnerable…"

¶ 18      On July 28, 2015, Keisha testified in front of the grand jury. ASA Cooper spoke with Keisha before presenting her testimony before the grand jury, and Keisha did not have any concerns about

the way she had been treated by the police. She never said that the police had taken advantage of her or that she had been shown a photo prior to viewing the photograph array. The State introduced the complete transcript of Keisha's grand jury testimony. Keisha testified that she was outside with Francis and their three children when she saw defendant ride by on a bicycle. She had previously seen defendant from his Facebook postings as well as "a few times over the summer around the neighborhood[.]" She knew that defendant belonged to the "PBG[,]" which was gang in opposition to Francis' gang. While she and Francis tried to gather up the children, she saw defendant come around the side of the building wearing a black hooded sweatshirt with the hood cinched tight around his face. She was still able to see his eyes, nose, and his hair sticking out of the top of the hoodie. At that point, she saw defendant shooting at Francis from approximately a car length away. Afterwards, defendant ran back in the same direction where he came from.

¶ 19    In her testimony before the grand jury, she further testified that she identified defendant as the shooter to the detectives at the hospital. She subsequently went to the police station where she identified a photograph of defendant, from a photograph array, as the person who shot Francis. She testified that she was treated "good" by the police and no threats or promises were made to her. She returned to the police station two days later and spoke with ASA Engrebretson. She identified defendant from still photographs taken from the security video showing defendant on a bicycle and then running.

¶ 20    During closing arguments, the State recapped the evidence presented at trial and, over defense objection, argued that, as a result, defendant "earned his seat at that table right there. And…you now know what he has known all along: He is guilty of first degree murder." At the close of the closing argument, the State argued, over defense objection, that "we know he's guilty of murder…" After the trial court overruled the objection, the State continued, "We know it was the

defendant. We also know that he intended to kill Vallan Francis. And we know that when he killed Vallan Francis, he was the only one out there with a weapon…"

¶ 21    Without any objection by defendant, the State argued, "…It is time for you to let him know that he cannot escape or take advantage of what he did…" and urged the jury to sign the verdict form "that the evidence in this case support and justice demands - - justice for Vallan, justice for this defendant."

¶ 22    During the defense closing argument, defendant argued that Keisha was reluctant to testify because "she really doesn't believe that she was correct, that she is saying what happened back then was she picked him out for the wrong reasons. And because of that, she doesn't want to be here or have any part of this anymore." Defendant also argued:

> "…Like she was reluctant to come here. Just perhaps maybe she's reluctant because she doesn't really believe that she was correct, that she is saying what happened back then was she picked him out for the wrong reasons. And because of that, she doesn't want to be here or have any part of this anymore. After all, she lives out of state and has for a long time. She's certainly not afraid of him anymore. She's not afraid of anybody anymore about what would happen. So why would she come in here and say, you know, I don't know?"

¶ 23    During rebuttal argument, the State responded to defendant's argument and explained the inconsistency of her testimony compared to her prior statements by arguing, without any objection by the defense, that she "was less than forthcoming when she came here because he's staring her down. She has four good reasons to come in here and lie to you folks: Her four children."

¶ 24      The jury found defendant guilty of first degree murder of Francis and personally discharging a firearm that proximately caused Francis' death. Defendant filed a post-trial motion for a new trial and then a supplemental motion, adopting the previous motion, after a new attorney filed an appearance to represent him. After the trial court denied the supplemental motion for new trial, defendant was sentenced to consecutive sentences of 30 years' imprisonment for first degree murder and 25 years' imprisonment for the firearm enhancement.

¶ 25      **ANALYSIS**

¶ 26      **I. Gang Evidence**

¶ 27      Defendant asserts that he was denied his right to a fair trial when the State presented prejudicial gang evidence consisting of defendant's membership in the Pooh Bear street gang and that the Pooh Bear street gang was at war with the Loc City street gang to which Francis belonged. First, he asserts that the State failed to establish that Keisha, a lay witness, had personal knowledge regarding this gang evidence required for foundational purposes pursuant to Illinois Supreme Court Rule 602. Ill.Sup.Ct.R. 602 (eff. Jan. 1, 2011). He further asserts the admission of Keisha's testimony regarding the gang evidence failed to meet the personal knowledge requirement pursuant to admission of a prior inconsistent statement under section 115-10.1(c)(2) of the Illinois Code of Criminal Procedure. 725 ILCS 5/115-10.1 (c)(2) (West 2010).

¶ 28      The State asserts that defendant forfeited his ability to complain about the introduction of the gang evidence in this case by failing to preserve it. Defendant responds that he preserved his claims by objecting to the admission of the gang evidence at several stages, such as opposing the State's motion to admit gang evidence, raising objections at trial, and including the issue in his motion for a new trial.

¶ 29                                        **A. Forfeiture**

¶ 30        As a threshold matter, we find that defendant failed to properly preserve this issue by failing

to raise this claim in his posttrial motion for a new trial. It is well-established that in order to

properly preserve an issue for appeal, a defendant must object to the purported error at trial and

specify the error in a post-trial motion. *People v. Bannister*, 232 Ill.2d 52, 65 (2008); *People v.*

*Enoch*, 122 Ill.2d 176, 186 (1988). While defendant argues on appeal that he preserved these

claims in his posttrial motion, he does not provide any support for how he did so. Defendant filed

a posttrial motion for a new trial and, after new counsel was appointed, a supplemental motion for

a new trial. He alleged in this original posttrial motion that the trial court erred in overruling

defendant counsel's objections to the State's questions that defendant was a gang member "on

conclusion grounds[,]" without any further explanation. When defense counsel had the opportunity

to argue these two motions, counsel chose to rely upon the written arguments in the initial motion.

The trial court addressed this particular claim and specifically found, "I cannot claim to fully

understand what that means." The trial court never interpreted this claim to include an attack on

the State's failure to establish the personal knowledge requirement for the admissibility of the gang

evidence. The trial court also never interpreted this claim to include an attack on the alleged

impropriety of the personal knowledge requirement under section 115-10.1(c)(2). Therefore, while

defendant seeks for this court to find that he properly preserved this issue for review, it is difficult

for this court to reach that conclusion in light of the lack of clarity and general terms utilized by

defendant in his posttrial motion and the trial court's clear expression of confusion. Such

generalities in a posttrial motion are insufficient to preserve defendant's claims for review. *See*

*People v. Moss*, 205 Ill.2d 139, 168 (2001) (defendant's arguments were not preserved for appeal

by a general allegation in posttrial motion that the prosecutor made prejudicial, inflammatory, and erroneous statements in closing argument).

¶ 31    Despite this forfeiture, defendant argues that the issue can be reviewed under either prong of the plain-error doctrine, or as a claim of ineffectiveness of his trial counsel. The plain-error rule bypasses normal forfeiture principles and allows us to review unpreserved claims of error in certain circumstances. *People v. Thompson*, 238 Ill.2d 598, 613 (2010). The plain-error doctrine allows a reviewing court to consider unpreserved issues where the evidence is so closely balanced that the error alone severely threatened to tip the scales of justice against the defendant (*People v. Herron*, 215 Ill.2d 167, 186-87 (2005)), or the error was so serious that it affected the fairness of the proceeding and challenged the integrity of the judicial process where the error affected a defendant's substantial rights. *Id.* at 187. Ill.S.Ct.R. 615(a) (eff. Jan. 1, 1967). In any event, a defendant must preliminarily establish there was error. *Id.*

¶ 32    After careful review of the evidence, we find that defendant's arguments are without merit. "When considering gang evidence, the trial court should apply the same balancing test it uses for all other types of evidence." *People v. Morales*, 2012 IL App (1st) 101911, ¶ 40; citing *People v. Johnson*, 208 Ill.2d 53, 102 (2003). As a general rule, evidence of gang affiliation "may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect." *Johnson*, 208 Ill.2d at 102. Our supreme court has held that despite the fact "that, particularly in metropolitan areas, there may be strong prejudice against street gangs," "evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible." *People v. Smith*, 141 Ill.2d 40, 58 (1990). Thus, the mere fact that some prejudice accrued to defendant is not enough to exclude such evidence. Such evidence can be admitted, for instance, to show a common purpose or design or to provide a motive for an otherwise inexplicable

act. *People v. Roman*, 2013 IL App (1st) 110882, ¶ 24; *Smith*, 141 Ill.2d at 58. Gang affiliation may also be admitted to establish identification of a defendant. See *Morales*, 2012 IL App (1st) 101911, ¶ 43.

¶ 33    As with other evidentiary rulings, the trial court's rulings with respect to gang-related evidence are reviewed for an abuse of discretion. *Johnson*, 208 Ill.2d at 102. This deferential standard requires the defendant to show that the trial court's decision to allow the evidence was arbitrary, fanciful or unreasonable or that no reasonable person would have taken the view adopted by the trial court. *People v. Patterson*, 2014 IL 115102, ¶ 114. Reasonable minds can differ as to whether certain evidence is admissible without necessitating a reversal of the trial court's ruling under this standard. *People v. Donoho*, 204 Ill.2d 159, 163 (2003).

¶ 34                           B. Illinois Rule Evidence 602

¶ 35    While defendant asked for the trial court to find that the gang evidence should not be admitted on the grounds that it was not relevant and its prejudicial effect outweighed its probative value, on appeal, he does not ask for this court to consider these grounds on appeal. Instead, he asks for this court to determine whether the State established the foundational requirement of a lay witness' personal knowledge, pursuant to Illinois Supreme Court Rule 602. Ill.Sup.Ct.R. 602 (eff. Jan. 1, 2011). Illinois Rule Evidence 602 provides: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter…" *Id*. In other words, under Illinois law, "'testimony of a lay witness must be confined to statements of facts of which the witness has personal knowledge.'" [internal quotation marks omitted] *People v. Risper*, 2020 IL App (1st) 160707, ¶ 35, quoting *People v. McCarter*, 385 Ill.App.3d 919, 934 (1st Dist. 2008).

¶ 36    Defendant posits that Keisha's assertion that defendant was a member of the Pooh Bear street gang was inadequate to prove that he did, in fact, belong to a gang. Relying upon *People v. Matthew*, 299 Ill.App.3d 914, 923 (1st Dist. 1998), defendant contends that the State could only show that he was a gang member in one of these three ways: (1) through his own admission, (2) through evidence that he shouted a gang slogan before shooting, or (3) through expert testimony from a police officer specializing in gang crimes, where the basis for the officer's assertion is presented to the fact finder. *Matthew* cited to *People v. Williams*, 262 Ill.App.3d 808 (1st Dist. 1994), to support this claim. To properly address defendant's claim, it is necessary to provide a more thorough consideration of *Williams* and how this court has interpreted it.

¶ 37    In *Williams*, the defendant argued that the witness' testimony that her boyfriend, the murder victim, and the defendant belonged to rival gangs was insufficient to establish that she had personal knowledge. *Id.* at 819. Initially, the court recognized that "[a] witness may testify only to facts within the witness's own personal knowledge, without drawing inferences or making conclusions. *Id.* at 820, citing *People v. Enis*, 139 Ill.2d 264 (1990). The court provided three different manners in which the State can demonstrate gang membership – the defendant's own admissions, evidence that the defendant shouted a gang slogan before the shooting, or through expert witness testimony. *Id.* at 820. Further, citing to *People v. Lucas*, 151 Ill.2d 461, 479 (1992), the court held that "[t]he bare assertion of a lay witness regarding gang membership, however, is not adequate." *Id.*

¶ 38    Subsequently, in *People v. Campbell*, 2012 IL App (1st) 101249, this court considered the decision in *Williams* and its impact on the admissibility of gang-related evidence. In *Campbell*, an eyewitness testified that he thought the defendant was a member of the Gangster Disciples, a rival gang, because he had previously seen the defendant hang around other members of that gang. On appeal, citing to *Williams*, the defendant argued that the bare assertion of a lay witness regarding

evidence of his gang membership was insufficient to warrant its admission. *Campbell*, 2012 IL App (1st) 101249, ¶ 22.

¶ 39     However, in rejecting this contention, *Campbell* found that, in *Lucas*, "our supreme court did not hold that the testimony of a lay witness regarding a defendant's gang membership was insufficient to prove that fact…" *Id*. at ¶ 24. *Id*. Instead, *Campbell* held that it would apply "the established standard regarding such evidence by considering whether the evidence was related to the crime charged and relevant to an issue in dispute and weighing its probative value against its prejudicial effect." [citation omitted] *Id*. Most importantly, the court rejected the defendant's challenge to the admission of the gang membership evidence on the basis of its foundation and found that there was no error. *Id*.

¶ 40     Likewise, here, this court rejects defendant's challenge to the admission of the gang membership evidence on the basis of its foundation. In *Campbell*, the State established the foundation for the admission of the eyewitness' when the witness testified that he thought the defendant was a member of the Gangster Disciples, a rival gang, because he had previously seen the defendant hang around other members of that gang. *Id*. Here, at the pre-trial hearing, the State presented an offer of proof that Keisha would testify that she previously became acquainted with defendant through their "friendship" on Facebook. They argued, in part, that Keisha had personal knowledge of defendant's membership in the Pooh Bear street gang based on viewing his Facebook posting in which he identified himself as a member of that gang. The State also argued that, based upon her relationship with Francis, she was aware of his membership in the Loc City street gang, and that there was an ongoing feud between these two gangs.

¶ 41     At trial, Keisha admitted that she told ASA Engrebretson that she was friends with defendant on Facebook and, on Facebook, defendant spoke "about the things he was involved with, including

the gang that he was part of…" Likewise, the State established the foundational requirement for Keisha's testimony that the Pooh Bear and the Loc City street gangs were feuding. Specifically, at trial, Keisha testified that she saw "[a] lot of arguing back and forth, stuff like that" between the Pooh Bear and Loc City street gangs. "It does not violate the personal knowledge rule to allow witnesses to testify to *their observations* so long as they do not provide their own interpretation of those observations." See *People v. Richardson*, 2013 IL App (2d) 120119, ¶ 10 (a witness' opinion may be admitted if the opinion is based on the witness' personal observations, is one that a person is generally capable of making, is helpful to a clear understanding of an issue at hand and does not provide a legal conclusion). It is well-established that a lay witness may testify to detailed, personally observed facts and opinions derived from those facts. See *e.g., People v. Fair*, 159 Ill.2d 51, 86 (1994) (a lay witness may give his or her opinion regarding the mental condition of the defendant relating to his addiction to cocaine). Thus, it can hardly be said that Keisha did not have personal knowledge of defendant's membership in the Pooh Bear street gang when she observed his Facebook postings about his gang membership, and she observed the feuding between these two gangs in the neighborhood where she lived. Therefore, there was an adequate foundation for the admission of Keisha's testimony that defendant belonged to the Pooh Bear street gang based upon defendant's admission on Facebook to his own membership.

¶ 42                    **C. Prior Inconsistent Statements**

¶ 43        In addition to attacking the admission of the gang evidence on foundational grounds, defendant also asserts that the admission of Keisha's prior inconsistent statements regarding this gang evidence was improper because Keisha did not have "personal knowledge" of the events for admissibility as prior inconsistent statements under section 115-10.1 of the Illinois Code of Criminal Procedure. 725 ILCS 5/115-10.1(c)(2) (West 2010). In other words, defendant asserts

that, because Keisha did not have personal knowledge of defendant's membership in a gang and the ongoing feud that existed between these two rival gangs, it was error for the prosecution to admit her prior inconsistent statements to ASA Engrebretson. We find that there was sufficient evidence to establish Keisha had personal knowledge, so it was proper to allow the admission of these prior inconsistent statements.

¶ 44        Section 5/115-10.1 of the Illinois Code of Criminal Procedure provides:

"evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement –

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceedings, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

¶ 45        As defendant recognizes, to satisfy the personal-knowledge requirement for the admissibility of a prior inconsistent statement as substantive evidence, the witness whose prior inconsistent statement is being offered into evidence must have actually seen the events that are the subject of that statement. *Id.*; *People v. Murray*, 2017 IL App (2d) 150599, ¶ 55. Here, as previously outlined,

Keisha testified to personally observing, on Facebook, defendant speaking "about the things he was involved with, including the gang that he was part of…" She also personally saw "[a] lot of arguing back and forth, stuff like that" between the Pooh Bear and Loc City street gangs. Consequently, there was evidence presented at trial to show that she had personal knowledge of this evidence. Therefore, defendant's reliance on *People v. Cook*, 2018 IL App (1st) 142134, is misplaced where the court in that case found that the prior inconsistent statement was inadmissible where the evidence "does not establish whether [the witness'] knowledge about the argument between defendant and [another] was based on [the witness'] observation of some event or whether he heard about it afterwards." *Id.* ¶¶ 46-48. Consequently, defendant did not establish that the trial court erred in allowing the State to present this evidence as prior inconsistent statements.

¶ 46                                      **D. Plain Error Test**

¶ 47        Even if the trial court erred in allowing the State to present this testimony, defendant cannot satisfy either prong of the plain error test. As to the first prong of plain error, we disagree with defendant characterizing the evidence as closely balanced. The analysis for the first prong of plain error has been found similar to the test used in considering a claim of ineffectiveness of counsel based on evidentiary error. See *People v. White*, 2011 IL 109689, ¶ 133. Under both analyses, the defendant must show that he was prejudiced, either because the guilty verdict may have been caused by the alleged error or because there was a "reasonable probability" of a different result had the evidence in question been excluded. *Id*; see also *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Thus, to prevail under plain error or ineffectiveness of counsel in this case, defendant must show that the evidence was so closely balanced that the gang evidence impermissibility led to his convictions. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense

assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. In conducting this evaluation, a court must assess the evidence on the elements of the charged offense or offenses, along with any evidence regarding the credibility of the witnesses. *Id*. Considering whether the evidence is closely balanced does not involve the sufficiency of close evidence but, rather, the closeness of the sufficient evidence. *Id*. at ¶ 60. If the defendant succeeds in carrying the burden of showing that the evidence is closely balanced, the error is actually prejudicial. *Id*. at ¶ 51.

¶ 48     Evidence has been found to be closely balanced where each side has presented credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account. *Id*. at ¶ 63; *Jackson*, 2019 IL App (1st) 161745, ¶ 48. In contrast, evidence has been deemed to be not closely balanced when one witness's version of events was either implausible or was corroborated by other evidence. See, *e.g.*, *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (evidence not closely balanced where circumstantial evidence supported State's witnesses' testimony while defendant's version of events "strained credulity."); *People v. Anderson*, 407 Ill.App.3d 662, 672 (2011) (evidence not closely balanced where defendant's version of events was implausible).

¶ 49     Here, the evidence was not closely balanced. The State presented the testimony of Keisha LeFlore, an eyewitness who was the girlfriend of the shooting victim.  It is clear from a review of the evidence that, within hours of the shooting, she identified defendant as the shooter to the police detectives at the hospital. Later, at the police station, she did not hesitate when identifying defendant as the shooter from a photo array lineup. The police recovered a bicycle near the scene of the shooting, and defendant's DNA was recovered from the rubber handgrip and brake levers of this bicycle. A security video corroborated Keisha's testimony as to the shooter entering the

alley behind the apartment building on a bicycle and running away from the area of the shooting. Keisha identified defendant as the person riding the bicycle and running away from the scene, from still photographs from the security video, as the same person who shot Francis. On the other hand, at trial, defendant did not present any evidence in own defense, and, instead, relied upon a strategy of attacking the strength of the identification testimony of Keisha as well as the DNA evidence. For the first time, on appeal, defendant suggests that the evidence is closely balanced because the security video shows two different people in the alley riding a bicycle and two different people walking/running away from the direction of the shooting. However, at trial, defendant had the opportunity to cross-examine Keisha about this evidence and did not do so. Moreover, he never argued to the jury that the shooter could have been the second person shown in the security video. We are not persuaded by defendant's suggestion that the security video supports the involvement of this other person. Consequently, after a thorough review of the evidence, we find that it was not closely balanced.

¶ 50    Moreover, this court also takes into consideration that any error in the admission of a prior inconsistent statement as substantive evidence is harmless where the same evidence was properly and substantively introduced though Keisha's grand jury testimony, and there is no personal knowledge requirement for grand jury testimony under section 115-10.1(c)(1). *People v. Cook*, 2018 IL App (1st) 142134, ¶ 49; *People v. Donegan*, 2012 IL App (1st) 102325, ¶¶ 37-38; *People v. Harvey*, 366 Ill.App.3d 910, 921-22 (1st Dist. 2006); *People v. Morales*, 281 Ill.App.3d 695, 701 (1st Dist. 1996).

¶ 51    We similarly reject the defendant's contention that he should be permitted to proceed with his claims under the second prong of plain error doctrine. Our courts have repeatedly held that second-prong plain errors are akin (although not limited) to structural errors, *i.e.*, systemic errors which

serve to erode the integrity of the judicial process and undermine the fairness of the defendant's trial. *People v. Clark*, 2016 IL 118845, ¶ 46; *People v. Thompson*, 238 Ill.2d 598, 608-609, 613 (2010). Such errors render "a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Id.* at 609. Examples of structural errors include: the complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial and a defective reasonable doubt instruction. *Id.*; See also *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149-150 (2006); *Johnson v. United States*, 520 U.S. 461, 468 (1997).

¶ 52 The reason behind the correlation between second-prong plain error and structural error analysis is that neither requires consideration of the strength of the trial evidence. In other words, these types of errors are automatically reversible, even in the most overwhelmingly strong cases. Contrary to defendant's position, by their very nature, evidentiary errors, as the one alleged here, must be reviewed in balance with the strength of the evidence. *People v. E.H.*, 224 Ill.2d 172, 180-181 (2006); *People v. Nevitt*, 135 lll.2d 423, 447 (1990). As such, they do not fall into the category of systemic errors that erode the integrity of the judicial system. Since defendant points to no case law to the contrary, we hold that the evidentiary error here was so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process.

¶ 53 Accordingly, we find no error in the admission of Keisha's testimony regarding defendant's gang membership and the gang conflict between defendant's gang and Francis' gang.

¶ 54 **II. Introduction of Repetitive Pretrial Identification**

¶ 55 Defendant contends that he was denied his right to a fair trial by the repetitive introduction of prior consistent statements of pretrial identification testimony by Keisha LeFlore. Defendant suggests that the introduction of this evidence improperly bolstered her identification of him. As a

general matter, evidentiary rulings are within the discretion of the trial court, and this court will not reverse the trial court's ruling absent an abuse of discretion. *People v. Caffey*, 205 Ill.2d 52, 89 (2001). Proof of a prior consistent statement made by a witness is inadmissible hearsay when used to bolster a witness's testimony. *People v. Heard*, 187 Ill.2d 36, 70 (1999). A prior consistent statement is admissible, however, to rebut a charge or an inference that the witness was motivated to testify falsely or that their testimony was of recent fabrication where the witness told the same story before the motive came into existence or before the time of the alleged fabrication. *People v. Williams*, 147 Ill.2d 173, 227 (1991). The codification of this rule is found in Illinois Rule of Evidence 613(c) (eff. Sept. 17, 2019), which provides:

> "(c) Evidence of Prior Consistent Statement of Witness. Except for a hearsay statement otherwise admissible under evidence rules, a prior statement that is consistent with the declarant-witness's testimony is admissible, for rehabilitation purposes only and not substantively as a hearsay exception or exclusion, when the declarant testifies at the trial or hearing and is available to the opposing party for examination concerning the statement, and the statement is offered to rebut an express or implied charge that:

> (i)     the witness acted from an improper influence or motive to testify falsely, if that influence or motive did not exist when the statement was made; or

> (ii)     the witness's testimony was recently fabricated if the statement was made before the alleged fabrication occurred."

¶ 56     Initially, defendant concedes that he forfeited this issue by failing to properly preserve it during trial and by failing to raise this issue in his posttrial motions. Nevertheless, defendant seeks review under the first prong of the plain error doctrine. A defendant who fails to preserve an issue in a

posttrial motion forfeits review of such issue if he can establish plain error. *People v. Enoch*, 122 Ill.2d 176, 186 (1988) Under the plain error doctrine, we may consider a forfeited claim when, under the first prong, "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error…" *People v. Piatkowski*, 225 Ill.2d 551, 565 (2007).

¶ 57     We find that there was no error in the admission of this evidence. Defendant fails to recognize that such testimony did not violate the prohibition against prior consistent statements as they were properly admitted statements of identification. Section 115-12 of the Code of Criminal Procedure of 1963 provides:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2018)."

¶ 58     That prior statements of identification are not regarded as hearsay finds further support in Illinois Rule of Evidence 801(d)(1)(B) (eff. Jan. 1, 2011), which provides:

> "(d) Statements Which Are Not Hearsay. A statement is not hearsay if
>
> (1) Prior Statement of Witness. In a criminal case, the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is
>
> ***
> (B) one of identification of a person made after perceiving the person."

¶ 59      Defendant's argument is the same argument made by the defendant in *People v. Ortega*, 2021 IL App (1st) 182396. In that case, this court found it permissible for the State to admit witnesses' prior consistent statements of identification to the police. *Id.* at ¶¶ 69-71 ("Thus, the general rule

prohibiting testimony of prior consistent statements by witnesses does not apply to statements of identification. *People v. Shum*, 117 Ill.2d 317, 342 (1987)); See also *People v. Newbill*, 374 Ill.App.3d 847, 851 (4th Dist. 2007) (police officer's testimony as to witness' description of the defendant was properly admitted statement of identification); *People v. Temple*, 2014 IL App (1st) 111653, ¶¶ 41-42.

¶ 60      We, likewise, reject defendant's reliance on *People v. Anderson*, 2018 IL App (1st) 150931, and find that it does not alter the conclusion. *Ortega* distinguished *Anderson* by finding:

> "In *Anderson*, in addition to finding an error in the introduction of an unproven threat attributed to the defendant and reliance on that evidence by the State in closing argument, the court also found an error in the introduction of testimony of a prior consistent statement. The witness not only testified that he identified the defendant three days after the shooting, but was also permitted to testify about his handwritten notes made on the photos that were used to identify the defendant. The court found that the initial identification testimony as admissible, but that the handwritten notes were improperly prejudicial where they unfairly bolstered the trustworthiness of the witness in this closely balanced case." [citation omitted] *Id.* at ¶¶ 42, 47-48.

¶ 61      Moreover, defendant's reliance upon the repetitive nature of the admission of this testimony has already been addressed and rejected by this court. See *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 50; *People v. White*, 2011 IL App (1st) 092852, ¶¶ 49-54; *People v. Maldonado*, 398 Ill.App.3d 401, 423 (1st Dist. 2010); *People v. Johnson*, 385 Ill.App.3d 585, 608 (1st Dist. 2008).

In this case, we see no reason to depart from this court's uniform rejection of this argument in these earlier cases.

¶ 62                    **III. Improper Remarks in Closing Argument**

¶ 63      We next address defendant's claim that the State made several improper comments during closing argument. "[I]t is well established that a prosecutor is allowed wide latitude in closing argument [citation] and it is entirely proper for the prosecutor, during closing argument, to comment on the evidence offered at trial and to draw legitimate inferences from the evidence, even if those inferences are detrimental to the defendant." *People v. Desantiago*, 365 Ill.App.3d 855, 866 (1st Dist. 2006). Moreover, the State is permitted to remark upon matters of common knowledge and experience during closing arguments. *People v. Runge*, 234 Ill.2d 68, 146 (2009). "While a prosecutor may not make arguments or assumptions that have no basis in evidence, improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused." *People v. Sutton*, 353 Ill.App.3d 487, 498 (1st Dist. 2004). "In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety, and the complained-of remarks must be placed in their proper context." (Internal quotation marks omitted.) *People v. Caffey*, 205 Ill.2d 52, 104 (2001).

¶ 64      Defendant observes that there is currently a split in the appellate court regarding which standard of review should apply to issues regarding prosecutorial misconduct in closing argument. This split stems from two statements made by the Illinois Supreme Court in *People v. Wheeler*, 226 Ill.2d 92, 121 (2007), which suggested that the *de novo* standard applies, and *People v. Blue*, 189 Ill.2d 99, 128 (2000), which suggested that the abuse of discretion standard applies.

¶ 65    In *Phagan*, this district found that the abuse of discretion standard is the proper standard, as "the trial judge is present for the entire trial, * * * has the benefit of 'hearing the remarks of counsel on both sides' and is better situated to determine whether anything that happened or was said justifies the challenged remark." *People v. Phagan*, 2019 IL App (1st) 153031, ¶¶ 48-50 (quoting *North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486, 502 (1892)); See also *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 128. In making this determination, we noted that "the pedigree for an abuse of discretion standard spans more than a hundred years." *Id*. at ¶ 49 (citing *People v. McCann*, 247 Ill. 130, 170-71 (1910), and *Bulliner v. People*, 95 Ill. 394, 405-06 (1880)).

¶ 66    Application of the *de novo* standard, however, "does not enjoy similar historical support," as the court in *Wheeler* based its application of the *de novo* standard on *People v. Graham*, 206 Ill.2d 465 (2003); *Phagan*, 2019 IL App (1st) 153031, ¶ 51. As we observed, the *Graham* court referenced two different issues raised by the defendant, one of which was the defendant's challenge to the prosecutor's remarks in closing argument, and stated, "We review this legal issue *de novo*,'" without distinguishing the two claims. *Id*. (quoting *Graham*, 206 Ill.2d at 474). Moreover, the *Graham* court considered the prosecutorial misconduct issue under the framework of an ineffective assistance claim. *Id*. ¶ 52 (citing *Graham*, 206 Ill.2d at 476-77)), and ineffective assistance claims are reviewed *de novo. Id*. (citing *People v. Demus*, 2016 IL App (1st) 140420, ¶ 27)). Therefore, it was unclear whether *Graham* was applying *de novo* standard as to the prosecutorial misconduct claim or the ineffective assistance claim. *Id*.

¶ 67    We agree with our reasoning in *Phagan* and conclude that defendant's prosecutorial misconduct claims are more appropriately reviewed under the abuse of discretion standard. *Id*. ¶¶ 48-50. Under this standard, "[t]he regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks

will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *Blue*, 189 Ill.2d at 128.

¶ 68    Moreover, defendant concedes that he failed to properly preserve his argument regarding the alleged impropriety of these remarks by failing to include this issue in his posttrial motion for a new trial. *People v. Bannister*, 232 Ill.2d 52, 65 (2008); *People v. Enoch*, 122 Ill.2d 176, 186 (1988). He asks this court to review it under the purview of the first prong of the plain error doctrine. Consequently, our first task is to determine whether defendant has established that there was error. *People v. Herron*, 215 Ill.2d 167, 187 (2005).

¶ 69    Defendant suggests that the State's comment that he "earned his seat at that table right there[,]" undermined the presumption of innocence. As previously stated, we look at the closing arguments in their entirety and overturn a guilty verdict only where the prosecutor's comments resulted in substantial prejudice. Improper comments alone will not warrant reversal unless they are a material factor in convicting the defendant. *People v. Woods*, 2011 IL App (1st) 091959, ¶ 42. Here, leading up to this comment, the prosecutor properly recapped the evidence in this case to argue to the jury that defendant's actions "earned" him a seat at the defense table. This type of comment fell within the parameters as a proper comment by the prosecutor, during closing argument, on the evidence offered at trial and to draw legitimate inferences from the evidence. The prosecutor was merely explaining to the jury that, based upon the evidence presented, defendant was guilty of the offense. Thus, contrary to defendant's suggestion, we find that this line of argument was a fair comment on the evidence presented and did not undermine the presumption of innocence.

¶ 70    The prosecutor followed up this comment with, "And, ladies and gentlemen, you now know what [defendant] has known all along: He is guilty of first degree murder." Defendant suggests that this comment shifted the burden of proof and undermined the presumption of innocence. For

support, he does not cite to any Illinois authority on this issue and, instead, cites to two out-of-state cases. This court recognizes that, not only are cases from another state not binding (*People v. Harrison*, 2018 IL App (3d) 150419, ¶ 17), but we also recognize that these two cases are clearly distinguishable.

¶ 71    In *State v. Nye*, 46 Kan. App. 2d 182 (2011), the prosecutor argued, in the defendant's felony DUI case, that the intoxication may be inferred from his refusal to take a breath test because he knew that he was impaired. While the reviewing court found that this type of comment was proper, it found that that the prosecutor unfairly shifted the burden of proof when commenting that "We all know the result will be incriminating if he had taken it [the breath test]. Why is he now saying he's not guilty? He knew back then, 1st of February 2009. Now he's saying he's not guilty. Does that make any sense to you?" The reviewing court found that this comment "placed a burden on [the defendant] to take the breath test to prove his innocence." The primary point in that case is that the prosecutor asked the jury to consider that the defendant's refusal to take the test amounted to an indicator that he had been too intoxicated to drive safely, and that defendant knew it would show his guilt. Here, the prosecutor's comment was not directed toward defendant's refusal to cooperate with the police investigation and did not suggest in any way that if defendant had done so, it would have incriminated him. The prosecutor's comment did not mirror the comments in *Nye*. Thus, defendant's reliance on *Nye* is misplaced.

¶ 72    Moreover, defendant cites to *State v. Graves*, 668 N.W.2d 860 (Iowa 2003). In *Graves*, the reviewing court reversed and remanded the defendant's conviction based upon the cumulative effect of several errors. *Graves*, 668 N.W.2d at 868. The court found that the prosecutor's cross-examination of the defendant was improper when the prosecution aggressively questioned him about whether other prosecution witnesses were lying, but also found that the prosecutor erred in

telling the jury during closing argument that the defendant testified that one of the state witnesses was a liar, and repeatedly and explicitly called the defendant a liar. *Id.* at 868. Here, the prosecutor's comment that are not similar. The prosecutor in the case at bar did not repeatedly call defendant a liar or ask defendant to comment about the veracity of the other witnesses. In fact, the prosecutor could not do so because defendant never testified at trial. Instead, the prosecutor made this comment in the context of asking the jury to find defendant guilty. Thus, we find that there was no error in the inclusion of this comment.

¶ 73        Defendant also contends that the prosecutor improperly aligned herself with the jury by using the phrase, "we know" during closing argument. Specifically, at the conclusion of the closing argument, the prosecutor summarized the evidence and stated several times that "we know" that defendant is guilty of first degree murder and that he intended to kill Francis. In support, defendant cites to *People v. Vasquez*, 8 Ill.App.3d 679 (1st Dist. 1972) (prosecutor unambiguously identified himself as the thirteenth juror in the case). While true that a prosecutor is prohibited from aligning itself with the jury, the comments here do not reflect an explicit attempt by the prosecutor to align herself with the jury. Instead, these comments were utilized when the prosecutor was summarizing the evidence for the jury and expressing what the evidence revealed. Consequently, the comments were proper.

¶ 74        During the closing argument, the State argued that "…we know that when he killed Vallan Francis, he was the only one there with a weapon…" Defendant contends that the State improperly argued that defendant was the only one armed at the scene because it was not based upon the evidence presented at trial. We agree with the State that this comment was properly based upon the evidence presented at trial. Keisha was the only eyewitness who testified at trial. She testified at trial that she and Francis were in front of their apartment building, along with their three

children. She was asked if, right before the shooting, there were "any other adults outside at that time?" She responded, "No." Also, ASA Engrebretson testified at trial that when he interviewed Keisha, he asked her, "Anyone else out there have - - did you see anyone else out there with a gun?" She replied, "No." He then asked her, "Just Lil Shawn?" She replied, "Yeah." From this testimony, it is clear that the State's closing argument was properly based upon evidence presented at trial. On the other hand, defendant's argument is merely based upon his conjecture that Keisha did not have the opportunity to survey the scene because she was distracted by her desire to gather her children to get them away from harms away, and the security videotape showed two potential shooters. Notably, the security videotape did not show the actual shooting, so the record does not support defendant's conjecture that the other person shown in the security video from the nearby alley was also present at the scene of the shooting. Thus, there was no error in this line of argument.

¶ 75    Regarding that portion of the closing argument in which the prosecutor stated that "[i]t is time for you to let [defendant] know that he cannot escape or take advantage of what he did. And you can do that by signing the only verdict forms that the evidence in this case support and justice demands - - justice for Vallan, justice for this defendant[,]" defendant suggests that the prosecutor's reference to "justice" was improper. In support, defendant cites to *People v. Ward*, 371 Ill.App.3d 382, 425-26 (1st Dist. 2007), in which this court found that it was improper for the prosecutor to argue that the victim's family "want the person that killed their son brought to justice." We recognize, however, that more recently, we have considered this same claim and repeatedly found that it is proper for the prosecutor to ask for justice. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 105 ("A prosecutor in closing argument is permitted to exhort the jurors to do their job, and thus, we have repeatedly rejected claims that it was improper for a prosecutor to ask for justice for the victim."), citing *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 54; (it was not

"improper for the State to conclude its closing argument with comments to the jury that 'you have the power' and that the jurors 'hold in [their] hands the sword of justice…'"); *People v. Goins*, 2013 IL App (1st) 113201, ¶ 93 ("During closing arguments, the State may denounce the activities of the defendant and urge that justice be administered."). Thus, we cannot find error in the prosecutor's request for justice comment.

¶ 76    Defendant also contends that the prosecutor's request for the jury to "let [defendant] know that he cannot escape or take advantage of what he did…" amounted to plain error. In response, the State relies on *People v. Desantiago*, 365 Ill.App.3d 855, 865 (1st Dist. 2006), a case in which this court found it was proper for the prosecutor to comment "it's time for him to take responsibility for what he did." In finding this comment proper, the reviewing court contrasted the prosecutor's comment with those cases in which the prosecution encouraged the jury to convict the defendant to send a positive message to the law enforcement community and the community at large. *Id*. at 865.

¶ 77    In contrast, defendant cites to *People v. Williams*, 2020 IL App (1st) 163417. In *Williams*, this court criticized the prosecutor's repeatedly accusing the defendant of avoiding, running from, and declining responsibility for his actions. However, upon closer review, we recognize the factual distinctions between these two cases.

¶ 78    Initially, we recognize in *Williams*, the court found that the prosecutor's comments in both opening statements and closing arguments amounted to clear and plain error, but also found that reversal was not needed where the defendant could not establish either prong of the plain error test. That being said, in *Williams*, the comments by the prosecutors were pervasive and repeated in both opening statements and closing arguments. In part, the prosecutor's comments not only contrasted the defendant's decision to remain silent with another witness' decision to speak with

the police during the police investigation, but the prosecutor also made comments equating the defendant's "responsibility" with accepting guilt. Here, in sharp contrast, the isolated comment by the prosecutor was a request for the jury to find defendant guilty so that he could take responsibility for his actions. This comment did not in any way equate to the comments made by the prosecutor in *Williams*.

¶ 79     Defendant further suggests that, because there was no evidence in support, the State improperly argued that Keisha "was less than forthcoming when she came here because he's staring her down. She has four good reasons come in here and lie to you folks: Her four children." Defendant recognizes that it is not improper for the State to argue that Keisha was scared but contends that there no evidence to suggest that she was scared because of her children or that defendant was staring her down.

¶ 80     Defendant cites *People v. Mullen*, 141 Ill.2d 394, 408 (1990), in support of his argument that the State's comments were improper inferences, and not based on record evidence, of defendant threatening Keisha. In *Mullen*, the State suggested "that witnesses were reluctant to testify because they are afraid that the defendant would shoot them in the back if they did so." *Mullen*, 141 Ill.2d at 405. Because there was no evidence in the record that the defendant threatened or intimidated any witness the Illinois Supreme Court found that "[p]rosecutorial comments which suggest that witnesses are afraid to testify because defendant had threatened or intimidated then, when not based upon any evidence in the record *** are highly prejudicial and inflammatory." *Id*. at 405.

¶ 81     We reject defendant's reliance on *Mullen* and, instead, find that the State's argument was properly based upon the evidence and reasonable inferences therefrom. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 85 (distinguishing *Mullen* and finding that prosecutor's comment that witness "changes his story…when he's up there on the witness stand when he's up there on the

witness stand face-to-face with the killer" was proper); *People v. Davis*, 2018 IL App (1st) 152413, ¶¶ 69, 71 (prosecutor commented that "common sense" suggested that witness had reason to be afraid to testify at murder trial was proper); *People v. Smith*, 2012 IL App (1st) 102354, ¶ 62 (prosecutor comment that witness "was not willing to be as forthcoming as she was when the defendant was not seated in a room with her" was proper in light of discrepancies between witness' trial testimony and prior statement).

¶ 82    In the case at bar, the State never suggested that Keisha was reluctant to testify because of a specific threat or act of intimidation to her by defendant. The State's comment was also based on the evidence in the record. At the time of the shooting, Keisha and Francis were outside with their three young children while their children played nearby. She cooperated with the police investigation into the shooting. She agreed to speak with some detectives at the hospital and accompanied the officers to the police station where she identified defendant from a photo array on the day of the shooting. Subsequently, she identified defendant as the shooter when interviewed by ASA Engrebretson and during her testimony before the grand jury. She explained during her trial testimony that defendant was not present when she testified before the grand jury. She admitted at trial that she and her children moved away from the Chicago area soon after the shooting, that she, at one point, violated a court order to appear at defendant's trial, and that she did not wish to testify at trial.

¶ 83    Moreover, the State's argument was in response to defense counsel's argument that Keisha was reluctant to testify because "she really doesn't believe that she was correct, that she is saying what happened back them was she picked him out for the wrong reasons." *People v. Glasper*, 234 Ill.2d 173, 204 (2009) ("Statements will not be held improper if they were provoked or invited by defense counsel's argument.") A defendant cannot claim error where the prosecutor's remarks are

in reply to and invited by defense counsel's argument. *People v. French*, 2017 IL App (1st) 14181572, ¶ 48.

¶ 84    Also, in reviewing the propriety of each of these comments, we recognize that the jury was instructed more than once that that statements of attorneys in closing argument are not evidence and that it should disregard any such statement that was not based on the evidence. See Illinois Pattern Instructions Criminal, No. 1.03 (approved July 18, 2014). It is well settled that jury instructions "carry more weight than the arguments of counsel." *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103. For that reason, we have recognized that "[a] trial court's instructions that closing arguments are not evidence protect [a] defendant against any prejudice caused by improper comments made during closing arguments." *Id.* "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49.

¶ 85    Even if the prosecutor's remarks constituted error, however, we reiterate our finding that the evidence at trial was not closely balanced. As such, even if we were to conclude that an error occurred, we would necessarily conclude that defendant forfeited this issue and cannot seek its resolution under the plain error doctrine.

¶ 86    We therefore reject defendant's argument that he was denied his right to a fair trial by the arguments made by the prosecution during closing and rebuttal arguments.

¶ 87    **IV. Cumulative error**

¶ 88    Defendant further argues that when all these claims are reviewed together, they constitute cumulative error resulting in prejudice that denied him constitutionally protected right to a fair trial. However, we have found each of his above claims meritless. Having found no error, we cannot find that there was prejudicial cumulative error. See *People v. Caffey*, 205 Ill.2d 52, 118

(2001) (defendant was not entitled to a new trial on the basis of cumulative error where no error occurred at all).

¶ 89                                    **CONCLUSION**

¶ 90        For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 91    Affirmed.

¶ 92    PRESIDING JUSTICE HYMAN, specially concurring:

¶ 93        While I join the majority's judgment and reasoning, I write separately because this case raises troubling implications for gang evidence—indeed, any evidence—gleaned from social media. See supra, ¶¶ 41-42. No one has questioned the authenticity, accessibility, and integrity of the Facebook evidence despite one of Randall's three Facebook pages containing dozens of posts dated after his arrest and during his continuous incarceration.

¶ 94        Best I can tell, there has been little development in the law on social media evidence in Illinois. The Second District allowed authentication of Facebook posts or messages based on circumstantial evidence, likening social media accounts to text messages and emails. *People v. Curry*, 2020 IL App (2d) 180148, ¶ 55; but see *People v. Kent*, 2017 IL App (2d) 140917, ¶ 104 (failure to authenticate Facebook page where State failed to present evidence "that was not public knowledge, which would tend to show that defendant or someone acting on his behalf was responsible for the communication."). The court in *Curry* looked to evidence like the "appearance, context, and distinctive characteristics, which are to be considered with surrounding circumstances." *Id.* ¶ 56. As to the messages before it, the court found they showed personal knowledge of relevant individuals and occurrences. *Id.* ¶ 57. But Randall's case suggests approaching social media evidence the same way as single-source digital information (like text messages and emails) ignores the unique and individual features of each.

¶ 95      Randall, or someone purporting to be him, has three Facebook pages:

    (i)      One appears to have been created in mid-January 2020 and contains two posts, updating the profile and cover pictures. See Shawn Randall, Facebook, http://www.facebook.com/shawn.randall.5872 (Profile 1). Profile 1 lists Randall's home as Menard, Illinois, the site of the prison where he is serving his sentence. Both the "Intro" and the only post with text use language written in the first person;

    (ii)      The second Facebook page has the same profile picture and the most posts. See Shawn Randall, Facebook, http://www.facebook.com/shawn.randall.92 (Profile 2). Profile 2 has dozens of posts since Randall's arrest. Some posts can be attributed to another author. For example, they begin "Sister hack" in all capital letters, apparently referring to his sister's control of the account. Other posts are written in first person as if written by Randall; and

    (iii)      The third profile has even less connection with Randall. Its only obvious identifier is the person in the cover photo seems to be wearing the same t-shirt as Randall in photos on Profile 2. See Shawn Randall, Facebook, http://www.facebook.com/shawn.randall.92754 (Profile 3).

These profiles present a problem. First, we know from the text of posts on Profile 2 that at least one other person has access to it. We also can assume as much as to Profile 1 because the date of the posts come after Randall's sentencing. Even if Randall were responsible for some information on his profiles (say, photos of himself), he may not be responsible for everything. That difference becomes problematic for posts that have no self-identifying creator such as purely text posts, posts containing group photos, or photos taken by someone else.

¶ 96    Randall's multiple Facebook profiles reveal a problem unique to social media accounts and distinct from text messages or emails—anyone with access to a minimal amount of information about Randall's life could create an entirely fabricated online persona. Contrast that ability with impersonating a person by email or text message. While possible, this type of impersonation requires unlawful acts like hacking the account or stealing the password. One can fairly presume that an email came from a particular person's account if the email came from that person and we have evidence of the account's authenticity.  See e.g., Commonwealth v. Purdy, 945 N.E.2d 372, 380 (Mass. 2011) (finding emails authentic, "in the absence of pervasive evidence of fraud, tampering, or 'hacking,'" where they originated from defendant's account and came from hard drive on computer defendant admitted he owned and to which he could provide necessary passwords).

¶ 97    Social media is a unique space where full-scale impersonation and deception run rampant. See *e.g., Smith v. State*, 136 So. 3d 424, 432-33 (Miss. 2014) (explaining that "anyone can create a [Facebook] profile and masquerade as another person," meaning "the potential for fabricating or tampering with electronically stored information on a social networking sight [*sic*] is high.") (Discussing Miller, Samantha L., Note, *The Facebook Frontier: Responding to the Changing Face of Privacy on the Internet*, 97 Ky. L. J. 541 (2008-09)). And the problem extends beyond individuals. For example, the Court of Appeals of Georgia recently had to deal with a fake Twitter account, which a sitting justice of that court had to clarify was fake when referenced by another Twitter user. See Judge Stephen Dillard (@JudgeDillard), Twitter, (Apr. 20, 2022, 6:25 p.m.), https://twitter.com/judgedillard/status/1516921141545349120. Maybe an ordinary user would have been able to distinguish the fake account (which has now been suspended) and the real account, but usually that determination involves expert cyber security and the like. In my

view, our courts need a rule of evidence regarding the requirements to authenticate social media posts and accounts.

¶ 98    The present evidence rules and case law have not kept current with the diverse and omnipresent social media platforms. As the Supreme Court of Mississippi explained, "something more" than a name and photograph is needed to authenticate a social media message or post. Smith, 136 So. 3d at 433 (explaining additional factors). I believe the expanding use of social media evidence merits examination by the Illinois Supreme Court Rules Committee.